| | | | | | |
|---|---|---|---|---|---|
| Plain of Prayer | 1968 | | | ✓ | |
| Mendicants of Evening | 1973 | | | ✓ | |
| Jacob's Ladder | 1974 | | | ✓ | |
| Lucifer | 1975 | | | ✓ | |
| The Scarlet Letter | 1975 | | | ✓ | |
| Adorations (Classical Guitar) | 1975 | 1976 | | | ✓ |
| O Thou Desire Who Art About to Sing | 1977 | | | ✓ | |
| Shadows | 1977 | | | ✓ | |
| The Owl and the Pussycat | 1978 | | | ✓ | |
| Ecuatorial | 1978 | | | ✓ | |
| Frescoes | 1978 | | | ✓ | |
| Judith | 1980 | | | ✓ | |
| Acts of Light | 1981 | 1984 | | | ✓ |
| Andromache's Lament | 1982 | | | ✓ | |
| Phaedra's Dream | 1983 | | | ✓ | |
| The Rite of Spring | 1984 | Before 1993 | | | ✓ |
| Song (Song of Songs) | 1985 | | | ✓ | |
| Temptations of the Moon | 1986 | Before 1993 | | | ✓ |
| Tangled Night | 1986 | | | ✓ | |
| Persephone | 1987 | | | ✓ | |
| Night Chant | 1988 | Before 1993 | | | ✓ |
| Maple Leaf Rag | 1990 | 1991 | | ✓ | |
| The Eyes of the Goddess | 1991 | | | ✓ | |
| | Total=70 | Total=26 | Total=1 | Total=45 | Total=24 |

Joseph FRANCOLINO, Petitioner,

v.

Robert KUHLMAN, Superintendent, Sullivan Correctional Facility, and Eliot L. Spitzer, Attorney General, New York, Respondents.

No. 01 Civ. 3882(AGS).

United States District Court, S.D. New York.

Sept. 3, 2002.

Diarmuid White, Brendan White, New York, NY, for Petitioner.

Robert M. Morgenthau, Dist. Atty. of County of N.Y., New York, NY, Amyjane

Rettew, Asst. Dist. Atty., of counsel, for Respondent.

## *OPINION*

SCHWARTZ, District Judge.

### I. Introduction

Petitioner Joseph Francolino seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 seeking his release from custody arising from a November 18, 1997 judgment in the Supreme Court, New York County. Following an eight-month trial and twelve days of deliberations, a jury found Francolino guilty of a variety of charges stemming from his involvement in a private carting (i.e., waste disposal) cartel. He was sentenced to a term of imprisonment of ten to thirty years and ordered to pay a $900,000 fine.

Francolino argues that the manner in which his trial judge, Justice Leslie Crocker Snyder, was selected, was improper. Under a practice in place at the time, the District Attorney would bring wiretap and search warrant applications to a judge of his choosing. That judge would normally serve as the judge supervising the grand jury and presiding over the trial. In this way, Francolino argues, the District Attorney could in effect choose the judge who would hear any given case. Francolino asserts that the District Attorney submitted the wiretap and search warrant applications in this action to Justice Snyder, an allegedly pro-prosecution judge. Francolino alleges that Justice Snyder was biased against him and his co-defendants, and favored the prosecution throughout the criminal justice process, from the setting of bail through trial to the imposition of the sentence. According to Francolino, the alleged selection of a judge by the District Attorney deprived Francolino of his due process rights under the Constitution.

Separately, Francolino argues that he is entitled to habeas corpus relief because of a faulty jury instruction. In her charge to the jury, Justice Snyder included language that the jury should "determine the reasonable probabilities arising from the case [ ... ]." Francolino claims that this charge diluted the "reasonable doubt" standard for guilt in a criminal case and thus deprived him of his constitutional rights.

For the reasons set forth below, Francolino's petition for habeas corpus relief under 28 U.S.C. § 2254 is denied.

### II. Factual Background

#### A. Basis for Conviction

The prosecution of Francolino and his co-defendants stems from the city's efforts to eliminate the deleterious effects of organized crime on private carting (i.e., waste disposal). The mayor of the City of New York in a press release stated:

Since the industry was privatized in 1956, La Cosa Nostra controlled the carting industry through a cartel system victimizing over 250,000 businesses, dictating routes and rates. Because the cartel artificially inflated prices, its customers–the owners of small and large businesses throughout the city–were forced to pay the highest prices of anywhere in the nation.

This is the way it worked. Carting companies "owned" customers and bought or sold customers from one another. They didn't compete against each other for customers, because that was considered "stealing." The lack of competition robbed the cartel's customers, who were forced to pay the inflated prices, and the mob cartel intimidated any legitimate carting companies who sought to enter the market. If they tried to defy the cartel, they suffered the consequences.

Archives of Rudolph W. Giuliani, *Freeing the Economy from Organized Crime and Restoring Open, Competitive Markets* (Oct. 23, 1997), *available at* http://www.nyc.gov/ html/ rwg/html/97/orgcrime.html. According to the government, members of the cartel operated through four trade associations, and maintained a rigid "property rights" allocation scheme that granted each carter permanent "ownership" of a given location. At the same time, the cartel maintained the illusion of competition by utilizing institutionalized bid-rigging and a practice of selling carting "stops" to each other for forty to fifty times the monthly sum paid by customers. At the top of these associations were individuals with ties to organized crime, who allegedly enforced the above system through a combination of intimidation, concerted economic retaliation, and the threat of violence.

The government developed its case in large part by pursuing an undercover investigation. In early 1992, Chambers Paper Fibres ("Chambers") decided to expand from its paper recycling work into the garbage hauling market.[1] After Chambers successfully competed against a carter, the carter arranged to destroy a new Chambers garbage truck and to assault Chambers' president, Sal Benedetto. Chambers eventually permitted the government to conduct a long-term undercover investigation. Pursuant to the investigation, an undercover officer, Detective Richard Cowan, posed as Benedetto's second cousin "Dan" and worked full-time as a manager at Chambers.

During the course of the investigation, Chambers walked a delicate line between competing for customers in the face of the cartel's rules, and accepting those rules by rigging bids and paying compensation to cartel members against whom they had successfully competed. "Dan Benedetto" acquiesced in demands that Chambers pay more than a million dollars in "compensation" to cartel members, as well as $48,000 paid to Francolino personally for a "stop" or site that Chambers "took" from Francolino's company, Duffy Waste and Recycling Corporation ("DWR").

As a consequence of the government's investigation, in June 1995, a New York County grand jury, empanelled on November 9, 1994, returned a 114-count indictment against Francolino, sixteen other individuals, twenty-three corporations, and four trade associations. *See* Indictment No. 5614/95 (Francolino Exhibit ("Ex.") 22).[2] Prior to trial, ten individual defendants, two companies, and one trade association pled guilty. In February, 1997, the remaining defendants proceeded to a jury trial before Justice Leslie Crocker Snyder of the New York State Supreme Court, New York County.[3] During the trial, after hearing the undercover detective's direct testimony and the numerous recordings he made, most of the defendants pled guilty.

The trial continued for Francolino, co-defendant Alfonso Malangone, DWR, the Association of Trade Waste Removers of Greater New York, and two other companies.[4] After an eight-month trial capped

1. In the above press release, the company is referred to as "Chambers Paper Fibers."

2. In the Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, respondents state that the indictment named twenty-two corporations. However, the face of the indictment itself lists twenty-three corporations.

3. During the jury selection process, counsel for two of the defendants died and the case against them was severed. Both of these two defendants ultimately pled guilty.

4. The government lists Malangone's first name as "Alphonso"; however, Malangone's own appeal brief states his name is "Alfonso."

by twelve days of jury deliberations, the jury found Francolino guilty of one count of enterprise corruption, one count of attempted grand larceny by extortion in the first degree, four counts of grand larceny by extortion in the second degree, eight counts of grand larceny by extortion in the fourth degree, six counts of coercion in the first degree, one count of attempted coercion in the first degree, and nine counts of combination in restraint of trade and competition. Francolino was sentenced to an aggregate prison term of ten to thirty years, and was fined $900,000. Francolino, his company, his association, and co-defendant Malangone filed a direct appeal to the Appellate Division, First Department.[5] On December 21, 1999, the Appellate Division unanimously affirmed all four convictions. *See People v. Association of Trade Waste Removers of Greater New York*, 267 A.D.2d 137, 701 N.Y.S.2d 12 (1st Dep't. 1999). Francolino, his company, his association, and co-defendant Malangone then sought leave to appeal to the New York Court of Appeals. On March 21, 2000, Judge Albert Rosenblatt denied leave to appeal. *See People v. Association of Trade Waste Removers of Greater New York*, 94 N.Y.2d 916, 708 N.Y.S.2d 355, 729 N.E.2d 1154 (2000). Francolino's subsequent petition for a writ of certiorari was denied on October 2, 2000. *See Francolino v. New York*, 531 U.S. 918, 121 S.Ct. 277, 148 L.Ed.2d 202 (2000).

**B. Basis for Appeal**

Francolino seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 directing his release from custody. Francolino's petition is based on two arguments: first, that he was denied his due process rights by the prosecutor's alleged selection of the judge who presided over his case; and second, that the judge gave an improper jury instruction which diluted the reasonable doubt standard.

**1. Alleged Prosecutorial Judge–Shopping**

The core allegation in Francolino's petition for habeas corpus is that the District Attorney ("D.A.") effectively selected the judge who would supervise the grand jury investigating Francolino and preside over his trial.[6] The practice of which Francolino complains, which allegedly occurred in certain high-profile cases, is outlined in a recent Southern District decision:

> The alleged scheme is simplicity itself: the D.A. purportedly seeks out "strongly pro[-]prosecution judges to issue ex parte orders" such as search warrants or wire tap authorizations. After having thus initially involved a judge in a particular criminal matter, the D.A.'s office then allegedly requests [the Administrative Judge] to appoint that same judge to convene and preside over a special grand jury, a recommendation which has "almost always [been] accepted" by the Administrative Judge. Finally, the judge who has been selected to preside over that grand jury is frequently assigned to preside over the subsequent proceedings, including arraignments, pre-trial proceedings, trial, and sentencings. Thus, plaintiffs allege, the D.A. has effectively chosen the judge who presides over the entire criminal proceeding.

*New York Criminal Bar Assoc. v. Newton*, 33 F.Supp.2d 289, 290 (S.D.N.Y.1999)

---

**5.** The two other defendants, Delmar Waste and Delmar Recycling, were also convicted. Following the verdict, they paid $1 million in forfeiture and waived appeal.

**6.** The term "D.A." refers both to the District Attorney himself and his authorized representatives (i.e., Assistant District Attorneys).

(hereinafter, *"Newton"*) (citations omitted). The normal assignment system for criminal cases, adopted in 1986, is a random one. *See* N.Y. COMP.CODES R. & REGS. JUD.22, § 200.11 (2002). However, the rules permit the Administrative Judge to depart from the rules in certain circumstances. *See id.* at 200.11(d)(1)-(4). Moreover, the entire random assignment system is subject to the proviso, "Except as the Chief Administrator of the Courts may otherwise provide [ ... ]." *Id.* at 200.11(a).

Respondents do not directly challenge Francolino's contention that such a practice existed.[7] Indeed, in 1997, Administrative Judge Juanita Bing Newton stated in an affidavit that it was the "long-time practice" to give the District Attorney the "latitude to decide when a Special Grand Jury was needed and to select the judge to supervise the body [ ... ]." Newton Affidavit ("Aff."), at ¶ 12.[8] Moreover, respondents do not deny that it was the usual practice for the judge presiding over the special grand jury to subsequently preside over the trial. Instead, respondents argue that irrespective of the *de facto* practice, the Administrative Judge retained exclusive *de jure* authority to assign judges–the Administrative Judge always had the authority to transfer the case to a different judge "at any point." *Id.* at 6. However, respondents do not dispute Francolino's contention that ordinarily, the judge who presided over the grand jury would also preside over the trial. Indeed, respondents concede that the Administrative Judge had decided, four months before Francolino's trial began, that "all pending cases, including [Francolino's] should remain with the judge who had supervised the grand jury." *See* Opposition Brief, at 10. With regard to the instant action, respondents concede that prosecutors took the search warrant applications in the Francolino case to Justice Snyder, and later "sought Justice Snyder's permission to empanel a special grand jury to hear the evidence that had been gathered." Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus ("Opposition Brief"), at 6. As noted, Justice Snyder also presided over Francolino's trial and sentencing.

Francolino argues that prosecutors steered his case towards Justice Snyder

---

7. The parties disagree as to whether or not the practice described continues to exist. Administrative Judge Newton stated in an affidavit that the D.A. had been advised in February 1995 that the practice in question was being discontinued. *See* Newton Aff., at ¶ 4. On October 2, 1995, this advice was set forth in an internal memorandum to Supreme Court judges. *See id.* at ¶ 12. This memorandum "formalize[d]" the Administrative Judge's decision. *Id.* at ¶ 12. Francolino's argument to the contrary is based upon his argument that the *Newton* case, cited above, which challenged the same assignment system at issue here, was brought two years after the practice was supposedly discontinued. *See* Motion Brief, at 25–26. However, the *Newton* court notes that "[s]ometime in 1995, a prosecutor from the D.A.'s office telephoned Justice Edward J. McLaughlin and asked whether he would be available to preside over a grand jury." *Newton,* 33 F.Supp.2d at 290. It is certainly possible that the events at issue occurred before the Administrative Judge's decision, and before her memorandum formalizing her decision. Nonetheless, Francolino is correct to the extent that "prosecutorial judge-shopping [ ... ] continues to be an important concern to the bar [ ... ]." Motion Brief, at 26. This is evidenced by the fact that three bar associations last year urged the New York Court of Appeals to review this issue. *See, e.g., Judge–Shopping Appeal Backed by Bar Groups,* N.Y.L.J., Mar. 2, 2000, at 1.

8. Although nothing in the record appears to formally distinguish a special grand jury from a regular grand jury, the parties' submissions suggest that a special grand jury was used for lengthy, complex, and high-profile cases. Typically a special grand jury would spend an extended period of time on a single case, as opposed to issuing indictments in multiple, separate cases.

because of her allegedly pro-prosecution bias. He argues, *see infra,* that Justice Snyder was in fact biased in favor of the prosecution, and made various rulings that unfairly gave prosecutors an advantage. Additionally, Francolino argues that even in the absence of actual bias, the perception thereof (in light of the government's alleged selection of the judge in question) warrants reversal. *See* Memorandum of Law in Support of Petition for a Writ of Habeas Corpus ("Motion Brief"), at 28. Francolino turns to several articles that have been written about Justice Snyder.[9] New York Magazine profiled Justice Snyder in a piece entitled, "The Enforcer," in which she stated she "happen[s] to be an admirer of law enforcement"; the article also notes that "[d]efense attorneys complain that [Justice] Snyder is unabashedly pro-prosecution" and that she is considered "the darling of prosecutors." Nina Burleigh, *The Enforcer,* N.Y. MAG., Mar. 30, 1998, at 35, 38. National Association of Criminal Defense Lawyers president Gerald B. Lefcourt has stated that Justice Snyder is a "lifelong prosecutor" and that "defense lawyers do not believe they get treated fairly in her courtroom." Burleigh, at 39. A New York Times article about Justice Snyder states that according to some defense lawyers, friends, and colleagues, "as a former prosecutor, she acts like one on the bench, undermining the defense in ways large and small." Katherine E. Finkelstein, *Hard–Liner in Pearls and Basic Black Robe,* N.Y. TIMES, Dec. 20, 2000, at B2. She was featured in the CBS program, *60 Minutes* on March 11, 2001. Mike Wallace noted that Justice Snyder is "famous for her candor from the bench, plus the knockout maximum sentences she imposes." *60 Minutes* (CBS television broadcast, Mar. 11, 2001). He added that "[s]ome people say prosecutors love to have [Justice Snyder] on a case because [she] help[s] the prosecutor make the case." *Id.* During the course of the broadcast, Wallace also noted that Justice Snyder has been mentioned as a successor to the current D.A., Robert Morgenthau. Justice Snyder stated, "It's something that I think would be exciting." *Id.* Burleigh also notes that Justice Snyder "admits" to having "her eye on the [D.A.'s] job." Burleigh, at 35. The government does not contradict Francolino's contention that Justice Snyder has a reputation for being pro-prosecution. In light of this fact, the Court will assume, *arguendo,* that Justice Snyder has such a reputation.

Francolino argues that in the instant case, the D.A. selected Justice Snyder in anticipation of favorable treatment. *See* Motion Brief, at 28. He adds that "Justice Snyder's well-cultivated public image as 'the Enforcer' and as 'famously-pro-prosecution,' [ ... ] graphically supports the inference here." *See id.* at 28 n. 11. Francolino and other co-defendants made a pretrial motion to reassign the case to a judge "selected in accordance with the Due Process Clause of the state and federal constitutions." *See* Motion Brief, at 3 (citation omitted). The prosecutor would neither admit nor deny that it had selected Justice Snyder, stating only that Justice Snyder was selected "with the approval of" the Administrative Judge and in accordance with pertinent procedures. *See* Letter of Assistant District Attorney Patrick J. Dugan dated November 28, 1995, annexed as Exhibit ("Ex.") E of Notice of Motion and Affirmation submitted by The Association of Trade Waste Removers of Greater New York, Inc., dated February 16, 1996. The

9. The Court reviews these media reports not to determine the truth of the matter they assert, but to provide context for Francolino's arguments that Justice Snyder has a *reputation* for bias.

motion for reassignment was denied, without the hearing requested by movants, in a written decision by Justice Snyder dated May 13, 1996. In the decision, Justice Snyder states that she has "examined her conscience and is convinced that she can give both sides a fair trial." *See* Decision of Justice Snyder on Defendants' Motion for Re–Assignment ("Reassignment Motion"), appended to Francolino's 28 U.S.C. § 2254 Petition as Ex. A. The decision goes on to state that the assignment of this case was done in "accordance with the rules of the Administrative Judge" but does not address the constitutionality of those rules. Justice Snyder also stated that the defense's position that a judge's familiarity with a case should result in reassignment was an "absurdity," and denigrated the defense's sur-reply brief.

Francolino renewed the motion for reassignment during the course of his trial after the Administrative Judge submitted an affidavit in an unrelated proceeding stating that the "District Attorney had been advised in February, 1995 that the practice of the District Attorney selecting a judge to empanel and supervise a grand jury and to receive any indictments voted by such body was being discontinued." Newton Aff., at ¶ 4.[10] The renewed motion was denied in open court the day it was filed, without a response by the prosecutor or any comment by the court. *See* Trial Transcript ("Trial Tr."), at 5676.[11]

Francolino contends that he is entitled to habeas corpus relief *per se*, without regard to whether he suffered prejudice, because any trial in which the prosecution selected the judge is inherently tainted by the appearance of partiality and is rife with the risk of prejudice. Francolino also argues that the above notwithstanding, he suffered actual prejudice at the hands of Justice Snyder so as to require habeas corpus relief.[12]

### 2. Alleged Faulty Jury Instruction

Francolino's ancillary argument is that he is entitled to habeas corpus relief because of a faulty jury instruction.[13] Specifically, Justice Snyder instructed jurors to "determine the reasonable probabilities arising from the case after carefully analyzing and weighing the testimony of each witness and all the other evidence in the case." *See* Motion Brief, at 53. Francolino states that this part of the jury instruction improperly diluted the standard of proof beyond a reasonable doubt, effectively directing the jury to apply a preponderance of evidence standard. *See id.* at 55. Respondents argue that the challenged instruction must be analyzed in the context of the entire jury charge, and that such analysis reveals that the language in question did not improperly instruct the jury to apply a lower standard of proof. *See* Opposition Brief, at 81.

**10.** As noted *supra,* the special grand jury investigating Francolino was empanelled on November 9, 1994.

**11.** On this page of the trial transcript, Justice Snyder simply states, "Your motion, Mr. White, is denied." It is not clear about which motion Snyder is speaking; however, Francolino asserts, and the Court has no reason to doubt, that her statement was in reference to Francolino's renewed motion to reassign the case.

**12.** In support of his argument, Francolino cites numerous instances in which Snyder's alleged bias unfairly disadvantaged the defense's case, from arraignment through sentencing. These discrete instances are examined *infra* and need not be set forth in detail here.

**13.** Francolino's jury instruction argument consists of four-and-a-half pages of his nearly sixty page brief.

## III. Standard of Review

■ The Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of habeas corpus relief available pursuant to 28 U.S.C. § 2254. The amended habeas corpus statute states in relevant part:

> (d) An application for a write of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. [ . . . ]

Thus, habeas corpus review under AEDPA is presumptively deferential to a denial of relief in state courts, assuming the claim was adjudicated on the merits. The determination of whether a state court is to be accorded deference is simple when the state court cites Supreme Court precedent. A much more difficult question is whether a summary determination by a state court is to be analyzed under the deferential AEDPA standard or under the *de novo* standard that existed before AEDPA. In the instant case, Francolino argues that the state court (i.e., the Supreme Court, Appellate Division, First Department ("Appellate Division")), did not adjudicate the case on the merits. Alternatively, he argues that the state courts' rejection of Francolino's claim involved an unreasonable application of clearly established fed-

eral law, as determined by the Supreme Court. *See* Motion Brief, at 13.

### A. Alleged Prosecutorial Judge–Shopping

In denying Francolino's appeal with regard to the alleged prosecutorial judge-shopping, the Appellate Division held:

> The process by which the Trial Justice was assigned to preside complied with the applicable rules and was in no way prejudicial to defendants (*see, Matter of Coastal Oil New York, Inc. v. Newton*, 231 A.D.2d 55, 660 N.Y.S.2d 428, *lv.* denied 91 N.Y.2d 808, 669 N.Y.S.2d 261, 692 N.E.2d 130).

*People v. Association of Trade Waste Removers of Greater New York*, 267 A.D.2d 137, 701 N.Y.S.2d 12, 16 (1st Dep't 1999) (hereinafter *"Trade Waste"*). The cited case, *Coastal*, in turn only cites a single federal case for the proposition that "prosecutorial judge-shopping" is "not a cognizable injury," which Francolino argues, with some merit, is not directly on point.[14] *Coastal*, 660 N.Y.S.2d at 429.

■ Determining whether such a cursory decision amounts to adjudication on the merits is a thorny issue with which the Second Circuit has grappled with some difficulty.[15] Recently, the Second Circuit has determined that a state court adjudicates a state prisoner's federal claim on the merits when it "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir.2001). The fact that a state court decision on the merits is cursory or summary does not vitiate the fact that the issue was adjudi-

---

14. The case cited in *Coastal* is *United States v. McQuillan*, 385 F.Supp. 1308 (E.D.N.Y.1974), which merely held that "a defendant has no vested right to have his case tried before any particular judge, nor does he have the right to determine the manner in which his case is assigned to a judge." *Id*. at 1310.

15. *See, e.g., Washington v. Schriver*, 240 F.3d 101 (2d Cir.2001), *superceded by Washington v. Schriver*, 255 F.3d 45 (2d Cir.2001).

cated for purposes of AEDPA: "Nothing in the phrase 'adjudicated on the merits' requires the state court to have explained its reasoning process. Nowhere does the statute make reference to the state court's process of reasoning." *Id.* at 311.

■ Notwithstanding the above, it is not entirely clear that the Appellate Division actually disposed of Francolino's claims on the (federal) merits. The Appellate Division determined that the process by which Justice Snyder was assigned "complied with the applicable rules [ ... ]." *Trade Waste*, 701 N.Y.S.2d at 16. This argument does not squarely address the merits of the question raised by Francolino. The issue is not whether the applicable rules were complied with, but whether those rules in and of themselves violate the Constitution. *See, e.g.*, Reply Memorandum of Law in Support of Petition for a Writ of Habeas Corpus ("Reply Brief"), at 13. Similarly, the Appellate Division held that the assignment of Justice Snyder was "in no way prejudicial to defendants." *Id.* at 16. This argument also does not address the merits, because Francolino's primary argument concerning the assignment of Justice Snyder is not predicated on prejudice; rather, it invokes prejudice as an alternative argument. Instead, the thrust of Francolino's argument is that the assignment system is a *per se* constitutional violation, regardless of prejudice. *See* Appellate Division Brief of Association of Trade Waste Removers of Greater New York (in which Francolino joined) ("it is clear that a due process violation can be made out without a showing of actual prejudice [ ... ]"). Thus, determining that the process was abided by and that there was no prejudice does not address the merits of the constitutional questions raised by Francolino. Moreover, in Sellan, it was apparent that the Appellate Division had analyzed the Sixth Amendment issue in

the case, because the court stated that Sellan's "ineffective assistance of counsel claim" was denied. *Sellan*, 261 F.3d at 314. The term "ineffective assistance of counsel" makes it clear that a constitutional issue is at stake. In contrast, in the instant case, the Appellate Division merely stated that internal administrative rules were followed and that no prejudice resulted. The Appellate Division did not frame the issue in a constitutional light, and thus the Court cannot say that Francolino's constitutional claim was adjudicated. In light of the fact that Francolino's prosecutorial judge-shopping claims were not adjudicated on the merits in state court, the Court will examine these claims *de novo*.

■ However, this *de novo* review extends only to the threshold questions directly related to whether prosecutorial judge-shopping mandates *per se* reversal. With regard to the related question of prejudice, the Appellate Division has already adjudicated Francolino's claims. As noted above, a state court need not explain fully its reasoning process in order to be entitled to deference. Thus, on the question of whether Justice Snyder's rulings and remarks in the courtroom were prejudicial, this Court uses the deferential AEDPA standard (i.e., the state decision must stand unless it was contrary to or involved an unreasonable application of clearly established federal law).

**B. Allegedly Faulty Jury Instruction**

■ With respect to the jury charge argument, the Appellate Division merely stated that the "court gave correct and balanced jury charges on the People's burden of proof [ ... ]." *Trade Waste*, 701 N.Y.S.2d at 15. No case was cited in support of this statement. Francolino argues that the Appellate Division did not adjudicate the question of the allegedly faulty jury instruction because by its own admission, it examined the jury charge

relating to burden of proof, not standard of proof. According to Francolino, burden of proof in a criminal case means that the government has the burden of proving the defendant guilty. Francolino states that the appeal concerned the standard of proof—in other words, the requisite level of proof (i.e., beyond a reasonable doubt) required to convict a defendant of a crime.

The Court is not persuaded by Francolino's argument. The term "burden of proof" "includes both the *burden of persuasion* and the *burden of production*." BLACK'S LAW DICTIONARY 190 (7th ed.1999). The term "standard of proof" as used by Francolino is more commonly referred to as "burden of persuasion." Thus, the Appellate Division's conclusory statement that the "court gave correct and balanced jury charges on the People's burden of proof" is sufficient to be deemed an adjudication on the merits of the question of whether the jury charge violated the Constitution. This is true notwithstanding the fact that the Appellate Division did not refer to the Constitution and did not cite a single case for support (either federal or state). Under the Second Circuit's holding in *Sellan*, a state court's conclusory and unsupported decision suffices as an adjudication on the merits.[16] Therefore, with regard to the question of whether the jury charge was in error, the Court will review the Appellate Division's decision under the deferential AEDPA standard.

## IV. Legal Analysis

### A. Alleged Prosecutorial Judge–Shopping

For the reasons stated *supra,* the Court examines Francolino's claim of prosecuto-

rial judge-shopping *de novo.* This is significant because, as Francolino notes, the constitutionality of the alleged prosecutorial judge-shopping in New York has not been squarely addressed by the courts. As noted, in Francolino's direct appeal, the Appellate Division stated that in Francolino's case, the process by which Justice Snyder was chosen "complied with applicable rules" but never analyzed whether those rules were in fact constitutional. *Trade Waste,* 701 N.Y.S.2d at 16. Moreover, *Coastal* held that prosecutorial judge-shopping is "not a cognizable injury" because petitioners' claims were "purely speculative," and because petitioners did not demonstrate that "the interest they assert in random assignment is within the zone of interest sought to be advanced by the court rules" (i.e., increased efficiency and judicial accountability). *Coastal,* 660 N.Y.S.2d at 429. Finally, in *Newton,* the court held that Coastal's claim concerning alleged prosecutorial judge-shopping was moot and that the other petitioners lacked standing. *See Newton,* 33 F.Supp.2d 289. As Francolino notes, this "fundamentally important issue [has] evaded review by either the New York Court of Appeals or federal court." Motion Brief, at 11.

Francolino argues that the mere fact of prosecutorial judge-shopping warrants habeas corpus relief, irrespective of whether he suffered actual prejudice. Similarly, he argues that any scenario in which the prosecutor effectively selects the judge is *per se* prejudicial. *See* Motion Brief, at 17. In the alternative, Francolino argues that even if the Court finds that a showing of

16. In *Sellan,* the Second Circuit held that the Appellate Division had adjudicated a case on the merits for purposes of AEDPA merely by stating that the petitioner's " 'ineffective assistance of counsel claim' was 'denied' ", without citing the Constitution or referring to relevant federal case law. *Sellan,* 261 F.3d at 314. While this approach has been criticized, *see, e.g., Washington v. Schriver,* 255 F.3d 45, 61–65 (2d Cir.2001) (Calabresi, J., concurring), the Second Circuit's position on the issue is clear.

prejudice is required, he has been so prejudiced by Justice Snyder's conduct while presiding over his arraignment, pre-trial motions, trial, and sentencing.

### 1. Judicial Findings of Fact

■ Generally speaking, the fact-finding function of a district court reviewing a habeas corpus petition is limited–the district court ordinarily defers to the factual findings made by the jury or the state court. In this case, however, the issue before the court concerns the facts not of Francolino's offense (where deference to the jury and state court would be warranted), but to the facts of how Justice Snyder was selected.[17] On this issue, the facts are not completely developed, though through no fault of Francolino. Indeed, as noted *supra*, his request for a hearing on the issue was denied by Justice Snyder. Notably, such a hearing was permitted in a similar judge-shopping case cited favorably by respondents, *United States v. Pearson*, 203 F.3d 1243, 1254 (10th Cir. 2000). Ninth Circuit precedent in a similar case indicates that such a hearing is preferred, if not required. *See Cruz v. Abbate*, 812 F.2d 571, 572 (9th Cir.1987) (holding that charges that the judicial assignment system is being manipulated for purposes other than the efficient administration of justice "must not remain unexamined and unanswered").

Additionally, Francolino's attorney, Diarmuid White, sent a letter to Assistant District Attorney Patrick Dugan, requesting information on the judicial selection process:

> This letter is to request that you advise me precisely how it was that Justice Snyder came to be the judge to whom the electronic surveillance application was made on or about September 24, 1992. For example, was she selected solely by the District Attorney's office; or solely by the Administrative Judge of the Supreme Court, Criminal Branch; or by the Administrative Judge in consultation with the District Attorney's office; or by some other means? Please also furnish me with the names of all persons involved in the selection process.

Letter from Diarmuid White to Patrick Dugan, dated November 8, 1995, annexed as Ex. D of Notice of Motion and Affirmation submitted by The Association of Trade Waste Removers of Greater New York, Inc., dated February 16, 1996. Assistant District Attorney Dugan refused to provide this information, stating only that "the review of eavesdropping applications in this case by Judge Snyder was done with the approval of the Administrative Judge of the Supreme Court and the procedures pertaining to such review." Letter of Assistant District Attorney Patrick J. Dugan dated November 28, 1995, annexed as Ex. E of Notice of Motion and Affirmation submitted by The Association of Trade Waste Removers of Greater New York, Inc., dated February 16, 1996. Dugan also stated that "[i]f *you* are in possession of facts to the contrary then bring whatever motion you deem appropriate and we will respond accordingly." *Id.* (emphasis added). While the Court would have appreciated a fuller record on the exact mechanism by which Justice Snyder was chosen and the Administrative Judge's role therein, respondents' own admissions provide a sufficient basis for the Court's

---

17. Francolino argues that the practice of judge shopping occurred with respect to complex and high-profile cases for which a special grand jury was used. He does not allege that such judge-shopping is the norm in all criminal cases. As noted *supra,* respondents have represented to the Court that the practice at issue in this case no longer exists. *See* Opposition Brief, at 6–7.

factual findings on the question of whether the system in place at the time permitted prosecutors to indulge in judge-shopping.[18]

Respondents have conceded that prosecutors took the search warrants and wiretap applications to Justice Snyder. *See* Opposition Brief, at 6. Respondents also concede that prosecutors sought Justice Snyder's permission to empanel a special grand jury to hear the evidence that had been gathered. *See id.* at 6. In both instances, respondents assure the Court that prosecutors acted in accordance with the procedures in place at the time. *See id.* at 6. Respondents state that "under the rules in place at the time, when the indictment was returned in June 1995, it was assigned to Justice Snyder for all purposes [ ... ]." *Id.* at 6. Respondents note that Administrative Judge Newton retained the authority to transfer the case to a different judge at any time. *See id.* at 6.

Based on respondents' own statements, the Court concludes that the practice of judicial assignment at the time of Francolino's case permitted prosecutors to engage in judge-shopping in certain high-profile cases. Respondents' two arguments against such a finding lack merit. The first, that the selection of Justice Snyder was in accordance with the rules in place at the time, merely states that the prosecution's actions were permitted by the New York Supreme Court, but not that the system precluded judge-shopping. The second argument, that Administrative Judge Newton retained ultimate assignment authority, does not alter the fact that in the normal course of events, the judge selected by the prosecutor would preside over all aspects of the case, from search warrant and wiretap applications through sentencing. Respondents provide no instance of where the prosecution selected a judge and the Administrative Judge stepped in to transfer the case to another judge for any reason—administrative or otherwise. Thus, although Administrative Judge Newton may have retained *de jure* control over judge selection, *de facto* control over the selection of judges was in the hands of the prosecution.[19]

18. Moreover, it would be inequitable to deny Francolino relief on the basis that the record below was incomplete, given Francolino's numerous attempts to determine how Justice Snyder came to preside over his case.

19. The fact that the Administrative Judge had the *de jure* authority to override a prosecutorial judicial selection is not dispositive. In *United States v. Pearson*, 203 F.3d 1243 (10th Cir.2000), a case cited by respondents numerous times, the alleged prosecutorial judge-shopping consisted of the prosecutor rearranging the names of defendants on a superceding indictment and leaving the case number blank. The Clerk of the Court would then fill in the case number which would cause the case to be assigned to a certain judge. The prosecutor stated that it had left the case number blank because it was "up to [the clerk's office] to decide what case number would be assigned," and that the "[U.S. Attorney's office] did not want to make that decision." *Id.* at 1254. The Clerk of the Court in *Pearson* had testified that "*as a gen-*eral rule, cases involving superceding indictments were not randomly assigned to a new judge" but were "assigned to the case involving the defendant listed first in the superceding indictment." *Id.* at 1254 (emphasis added). Thus, in *Pearson*, the prosecutor never directly approached a judge (as occurred in the instant case) but instead left it to the clerk's office to make the decision, knowing however, that under general practice the case would be assigned to a particular judge. Notwithstanding the fact that the clerk and not the prosecutor was the agent who actually assigned the case to a judge, the court treated the case as an instance of prosecutorial judge-shopping even though, as the U.S. Attorney noted, the Clerk of the Court had the ultimate authority in assigning cases. The relevant point is that the court understood that the system in question "*could be* manipulated to obtain a particular judge." *Pearson*, 203 F.3d at 1253 n. 2. The instant case, where the prosecutor approached Justice Snyder concerning the search warrant and wiretap appli-

## 2. Prosecutorial Judge–Shopping Gives the Appearance of Partiality

■ Any criminal justice system in which the prosecutor alone is able to select the judge of his choice, even in limited types of cases, raises serious concerns about the appearance of partiality, irrespective of the motives of the prosecutor in selecting a given judge.[20] The Supreme Court " 'repeatedly has recognized [that] due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities.' " *United States v. Pearson*, 203 F.3d 1243, 1257 (10th Cir. 2000) (quoting *Schweiker v. McClure*, 456 U.S. 188, 195, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982)). The importance of impartiality carries over to the criminal justice system as a whole, including the process of the selection of the judge. Leaving aside the question of the prosecutor's motives, the mere appearance of partiality, even if unfounded, greatly undermines the credibility of the criminal justice system. As the Supreme Court has noted, "to perform its high function in the best way 'justice must satisfy the appearance of justice' [ ... ]" *Schweiker*, 456 U.S. at 196, 102 S.Ct. 1665 (citations omitted). *Cf. J.E.B. v. Alabama*, 511 U.S. 127, 161 n. 3, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (Scalia, J., dissenting) ("Wise observers have long understood that the appearance of justice is as important as its reality").

Francolino argues that the system of judicial selection for complex and high-profile cases in place at the time gives the appearance of partiality. *See, e.g.*, Motion Brief, at 21, 29. Respondents respond to this argument by noting that a prosecutor's choice of judges is necessarily limited to a group of judicial officers "who have undergone the process of selection and appointment, [and] who have sworn to uphold the law and defend the Constitution [ ... ]." Opposition Brief, at 17 (quoting *United States v. Pearson*, 203 F.3d 1243, 1262 (10th Cir.2000)). This may be true, but respondents' position ignores the *Pearson* court's earlier citation of the admonition given by the Supreme Court:

> Judges are not fungible; they cover the constitutional spectrum; and a particular judge's emphasis may make a world of difference when it comes to rulings on evidence, the temper of the courtroom, the tolerance for a proffered defense, and the like. Lawyers recognize this when they talk about "shopping" for a judge; Senators recognize this when they are asked to give their "advice and consent" to judicial appointments; laymen recognize this when they appraise the quality and image of the judiciary in their own community.

*Laird v. Tatum*, 409 U.S. 824, 834–35, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (quoting *Chandler v. Judicial Council of Tenth Circuit of the United States* [sic], 398 U.S. 74, 137, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970) (Douglas, J., dissenting)). The fact that all judges on a given court have been vetted by a selection and appointment process and that each has taken an oath may mean that each is entitled to equal respect, but does not mean that all judges are identical.

Respondents also argue that Francolino's analysis is flawed because it supposedly "rests on the unwarranted presumption that any judge selected by the prosecutor must necessarily be partial to the prosecution." Opposition Brief, at 16. Instead, respondents contend that prosecutors

---

cations and later about convening a special grand jury is, if anything, a more clear-cut case of prosecutorial judge-shopping.

**20.** With respect to this section, partiality refers to partiality of the criminal justice system, and not necessarily the partiality of the individual judge concerned.

might use a range of criteria in selecting a judge–such as intelligence, experience, or familiarity with a particular area of law. *See id.* at 18. This argument sidesteps the issue because it focuses on what rubric the prosecution uses, rather than the overlying fact that it is the prosecution that is making that choice. What is troubling is not the specific criterion which is used, but the very process of prosecutorial selection. The concept of judge-shopping by a prosecutor for a judge whom the prosecutor believes would be inclined or biased in his favor offends our basic notions of justice. The idea that the prosecutor should be permitted to select a presiding judge on an allegedly "neutral" basis such as intelligence or experience is also problematic, because of the obvious implication that the prosecutor may choose a judge based on a real or perceived advantage, and attempt to weight the scales of justice, if only slightly, in his favor.[21] *See, e.g., McDonald v. Goldstein,* 191 Misc. 863, 191 Misc. 863, 83 N.Y.S.2d 620, 625 (1948), *aff'd* 273 A.D. 649, 79 N.Y.S.2d 690 (2d Dep't 1948) ("It can never be the duty or prerogative of the District Attorney to weigh the experience and diligence of the judges before whom he appears as attorney for one of the parties").

Even if one assumes, *arguendo,* that the prosecutor's motives were not improper,

"the *suggestion* that the case assignment process is being manipulated for motives other than the efficient administration of justice casts a very long shadow, touching the entire criminal justice system in the local courts [ ... ]." *Cruz,* 812 F.2d at 572. Similarly, the *Pearson* court noted that " 'public confidence in the integrity of the judicial process' [is] an important policy." *Pearson,* 203 F.3d at 1264 (quoting *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 858 n. 7, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988)). The court added that "the elimination, if possible, of even the appearance of impropriety is desirable." *Pearson,* 203 F.3d at 1264.

■ The former practice in the New York Supreme Court of permitting prosecutors to effectively select the judge is, as noted, problematic. Judge Posner has noted that the "practice of allowing the prosecutor to choose the grand jury and hence the trial judge is certainly unsightly [ ... ]." *Tyson v. Trigg,* 50 F.3d 436, 442 (7th Cir.1995). The Indiana Court of Appeals opined that the same system was "totally inappropriate." *Tyson v. Indiana,* 619 N.E.2d 276, 300 (Ind.Ct.App.1993). In the *Pearson* decision, cited by respondents at great length, the Tenth Circuit "strongly urge[d]" the District of Kansas to adopt a judicial assignment system that does not

---

**21.** Respondents argue that prosecutorial judge-shopping on the basis of "neutral" factors would "not involve any disadvantage to the defendant at all." Opposition Brief, at 17–18. While this might be true in some cases, it is a dubious proposition in many others. It is certainly conceivable that an aggressive prosecutor might believe he would be advantaged by trying his case before an inexperienced judge, or that an overworked defense attorney might be disadvantaged by trying his case before the judge with "the shortest queue." Opposition Brief, at 18. Even where the prosecutor's motives are not so invidious, the public may well lose faith in the criminal justice system if it believes that

the prosecutor had the potential to subtly stack the deck against defendants. Respondents' final suggestion, that prosecutors may choose a judge "randomly" is hardly a compelling argument in defense of prosecutorial judge-shopping. Opposition Brief, at 18. On a more fundamental level, "[t]hat a judge should ever be burdened with the thought that his assignments depended on the district attorney's appraisal of his court work is unthinkable in American jurisprudence." *United States v. Pearson,* 203 F.3d 1243, 1264 (10th Cir.2000) (quoting *McDonald v. Goldstein,* 191 Misc. 863, 83 N.Y.S.2d 620, 626 (1948)).

allow the prosecutor to select the judge. *Pearson,* 203 F.3d at 1265. In spite of the foregoing, however, the appearance of partiality itself is not grounds for habeas corpus relief absent a showing of prejudice. This is true for two reasons. First, it is the system of judicial selection, rather than the judge herself, that presents the appearance of partiality. Second, in any event, the "right to a judge who is free from the mere *appearance* of partiality is not part of due process at all, let alone a fundamental part." *Tyson v. Trigg,* 50 F.3d 436, 442 (7th Cir.1995) (Posner, J.). Thus, the system formerly used in New York, while problematic, does not mandate overturning Francolino's conviction absent a showing of actual prejudice (*see infra*).

### 3. A Showing of Actual Prejudice is Required

The Tenth Circuit, in *United States v. Pearson,* 203 F.3d 1243 (10th Cir.2000), noted that a system which permits *de facto* prosecutorial judge-shopping "raises substantial due process concerns." *Id.* at 1257. Francolino argues that the due process concerns are so great as to obviate the need to show prejudice; in other words, that the occurrence of prosecutorial judge-shopping alone mandates habeas corpus relief. *See* Motion Brief, at 17–30. Notwithstanding the due process concerns raised by prosecutorial judge-shopping, as noted *supra,* the Court, for the reasons detailed below, holds that the system of judicial assignment in question here is not grounds for habeas corpus relief absent a showing of actual prejudice.

Francolino argues that requiring him to show actual prejudice in addition to *de facto* prosecutorial judge-shopping is analogous to a situation in which "it is not enough to catch the butcher with his thumb on the scale; you must also show that the meat is tainted." Motion Brief, at

18. This colorful simile notwithstanding, the proposition that a showing of actual prejudice is required enjoys both logical and precedential support. On the logical level, absent a showing of prejudice, Francolino has failed to set forth how his position was worsened by virtue of the fact that the prosecutor effectively selected the judge. While the Court agrees that the system of prosecutorial judge-shopping gives the appearance of partiality, this alone is not grounds for habeas corpus relief, as noted above. Francolino does not deny that he could have had a trial before the allegedly biased Justice Snyder even in the absence of any prosecutorial judge-shopping. Of course, it is true that the prosecutorial judge-shopping in this case increased the chances of Justice Snyder being assigned to Francolino's case. However, Francolino does not argue that Justice Snyder was biased against him *because* the prosecutor selected her (i.e., Francolino never contends that the faulty assignment system *caused* Justice Snyder's bias–indeed, his citation of articles highlighting her pro-prosecution reputation would suggest that in Francolino's opinion, Justice Snyder would have been biased against him even if she had been randomly assigned to the case). Thus, appearances of partiality notwithstanding, Francolino is in the same position now as he would have been had Justice Snyder been assigned to his case randomly. While the prosecutor ensured that Justice Snyder would preside over Francolino's trial, unless Francolino can show that the assignment of Justice Snyder adversely affected his case (i.e., prejudiced him), he is in the same position that he would have been absent any prosecutorial judge-shopping (if Justice Snyder had been randomly selected to preside over his case). If Francolino is able to demonstrate prejudice, he will have successfully established that the prosecutorial judge-shopping had

a deleterious effect on his case, and therefore, that habeas corpus relief would be appropriate.

A substantial body of case law supports the respondents' contention that Francolino's conviction must stand absent a showing of actual prejudice. As a preliminary matter, it appears that there is neither Supreme Court nor Second Circuit precedent directly on point. However, numerous decisions of other circuit courts that have examined a judicial assignment scheme similar to the one in question here have held that a petitioner must show actual prejudice in order to warrant relief.

The question of prosecutorial judge-shopping was reviewed on habeas corpus appeal by the Seventh Circuit in *Tyson v. Trigg*, 50 F.3d 436 (7th Cir.1995) (hereinafter *Tyson II* ). The facts in *Tyson II* are similar to those in Francolino's case. In *Tyson II*, the prosecutor was permitted to take a request for an indictment to any of six judges, each of whom presided over a separate grand jury. As in the instant case, by taking a request for an indictment to a judge presiding over a grand jury, the prosecutor effectively selected the judge to preside at trial. *See Tyson II*, 50 F.3d at 438–39.[22] Writing for the court, Judge Posner noted that according to *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), relief can be granted in federal habeas corpus "only on the basis of a ground *dictated* by precedent." *Tyson II*, 50 F.3d at 440 (emphasis in original). He concluded that given the lack of precedent, any constitutional infirmity in the practice of judicial assignment was "subtle rather than obvious." *Id.* at 440. "But if it is subtle, habeas corpus is not

the place to challenge it." *Id.* at 440. The *Tyson II* court concluded that no relief was available for the prosecutorial judge-shopping where no prejudice was shown.[23]

■ The Court of Appeals of Indiana had previously considered the merits of Tyson's claim on direct appeal in *Tyson v. Indiana*, 619 N.E.2d 276 (Ind.App.1993) (hereinafter *Tyson I* ) (the Indiana Supreme Court denied Tyson's appeal). The court held that " '[b]efore an appellant is entitled to a reversal, he must affirmatively show that there was error prejudicial to his substantial rights.' " *Id.* at 300 (citation omitted). Tyson's appeal was denied because he "has failed to present any evidence to overcome that presumption [that the judge was unbiased and impartial] or show that he was prejudiced in any other manner." *Id.* at 300. The court stressed that actual prejudice is the touchstone of a due process violation in the context of prosecutorial judge-shopping: "Tyson has failed to show that the fairness of his trial was in any way affected by the method by which Judge Gifford was selected to preside; therefore, he has failed to demonstrate he was denied due process of law." *Id.* at 300.

The Tenth Circuit recently had occasion to analyze prosecutorial judge-shopping on direct appeal in *United States v. Pearson*, 203 F.3d 1243 (10th Cir.2000). In that case, one of the defendants alleged that the prosecutor manipulated the order of the defendants on the superceding indictment in order to have the case assigned to a particular judge. The court found that "Mr. Pearson's allegations are sufficient to

---

**22.** Unlike the instant case, defendant Tyson "disclaim[ed] making any charge of actual bias or prejudice." *Tyson II,* 50 F.3d at 442.

**23.** The Court cites *Tyson II* solely for the proposition that, given the lack of precedent,

a habeas corpus court cannot establish a rule that relief should be granted in the event of prosecutorial judge-shopping even if there is no actual prejudice.

demonstrate that the District of Kansas employed an assignment system that, in these circumstances, could be manipulated to obtain a particular judge." *Id.* at 1253 n. 2. The ultimate decision, however, was in the hands of the Clerk of the Court, not the prosecutor. *See id.* at 1254. Thus, the system at issue in *Pearson,* was functionally equivalent to the one at issue in the instant case: in both instances, prosecutors could, if they wished, use the system to obtain a desired judicial assignment, notwithstanding the fact that the ultimate authority for assignment resided elsewhere.

Francolino concedes that the *Pearson* court engaged in a "rather extensive analysis" of the legal issues raised by the judicial assignment practice. Motion Brief, at 21. As noted *supra,* the Tenth Circuit articulated its concerns as to the assignment system, *see id.* at 1257, 1263; notwithstanding such concerns, the court held that an assignment system that permits prosecutorial judge-shopping does not present structural error and is therefore subject to harmless error analysis:

> In summary, Mr. Pearson's allegations of an improper manipulation of the case assignment system raise substantial due process concerns. However, even if we accept Mr. Pearson's contentions as to the prosecution's motivation in reordering the defendants' names on the superceding indictment so that the case would be assigned to Judge Belot, the assumed due process violation arising

out of that conduct is not structural error and is harmless beyond a reasonable doubt. As a result, Mr. Pearson's due process challenge does not warrant a new trial.

*Pearson,* 203 F.3d at 1263.[24] The court's decision was motivated in part by the fact that any prosecutorial judge-shopping was limited to a group of judges who had sworn to uphold the law and defend the Constitution. *See id.* at 1263.[25] The *Pearson* court's decision was also based on the fact that "most federal courts that have addressed the issue of prosecutorial involvement in judicial assignments have not found due process violations." *Id.* at 1258.

While *Tyson II* and *Pearson* provide the most thorough analysis of prosecutorial judge-shopping, other courts that have considered the issue, even briefly, have required a showing of actual prejudice. Thus, in *Sinito v. United States,* 750 F.2d 512 (6th Cir.1984), the Sixth Circuit held that "[e]ven when there is an error in the process by which the trial judge is selected, or when the selection process is not operated in compliance with local rules, the defendant is not denied due process as a result of the error unless he can point to some resulting prejudice." *Id.* at 515.[26] Similarly, in *United States v. Gallo,* 763 F.2d 1504 (6th Cir.1985), the Sixth Circuit denied a defendant's appeal where the defendant argued that "prosecutors had engaged in a pattern of 'steering' significant criminal cases to a judge of their choice."

---

**24.** The Court notes that in *Pearson,* unlike in the instant case, the defendant did not allege that he was actually prejudiced by the assignment. *See Pearson,* 203 F.3d at 1263. This factual distinction does not alter the validity of the court's underlying decision–that a showing of actual prejudice is required in order to warrant relief.

**25.** As noted *supra,* this Court rejects the other logical basis for the Tenth Circuit's decision;

namely, that prosecutors might be motivated by "neutral" factors when judge-shopping.

**26.** The Court recognizes that in the instant case, Francolino is not claiming that local rules were not followed; rather, he argues that the local rules in place at the time permitted prosecutorial judge-shopping in violation of his rights to due process. Regardless, the court's analysis in *Sinito* applies.

*Id.* at 1532. Basing its decision in part on its holding in *Sinito,* the Sixth Circuit reaffirmed that a defendant "does not 'have the right to have his judge selected by a random draw'" and that a defendant must show actual prejudice. *Id.* at 1532 (citing *Sinito,* 750 F.2d at 515).[27]

The case which perhaps is most supportive of Francolino's position is *Cruz v. Abbate,* 812 F.2d 571 (9th Cir.1987) (Kozinski, J.). In that case, the Ninth Circuit held that a defendant "is entitled to have [the judicial assignment decision] made in a manner free from bias or the desire to influence the outcome of the proceedings." *Id.* at 574. The court added that "[e]ven the broadest discretion is capable of abuse if exercised in a manner that impairs rights guaranteed by the constitution." *Id.* at 574.[28] However, *Cruz* is distinguishable from the other cases cited above. In the previously-cited cases, the defendants did not allege actual prejudice; instead, they argued that the appearance of partiality was enough to mandate reversal. In contrast, in *Cruz,* the defendant alleged that the judge "'displayed arbitrariness and unfairness and has failed to comply with the principles of objectivity and impartiality.'" *Id.* at 574 (quoting petition). Implicit in this statement is the allegation that the defendant had suffered actual prejudice. Of course, this allegation made by the defendant was "not very specific," which accounts for the Ninth Circuit's remand of the case in order that petitioners could "state their allegations in greater

detail and present such evidence as they may have to support them." *Id.* at 574. While the Ninth Circuit went further than the *Pearson* or *Tyson II* courts in attacking the practice of result-oriented judicial selection, *Cruz* does not stand for the proposition that a showing of prejudice is not required to make out a due process violation.

The Supreme Court of Louisiana has held that "[t]o meet due process requirements, capital and other felony cases must be allotted for trial to the various divisions of the court, or to judges assigned criminal court duty, on a random or rotating basis or under some other procedure adopted by the court which does not vest the district attorney with power to choose the judge to whom a particular case is assigned." *State v. Simpson,* 551 So.2d 1303, 1304 (La. 1989). The court emphasized, however, that its holding was prospective only. *See id.* at 1305. In *State v. Trahan,* 576 So.2d 1 (La.1990), the Louisiana Supreme Court refused to expand its *Simpson* ruling in part on the ground that the petitioner made "no showing of particularized prejudice arising out of the former system." *See Trahan,* at 5.

Additionally, the cases cited for support by Francolino are not directly on point. For example, Francolino cites *Gray v. Mississippi,* 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987) for the proposition that "[t]he right to an impartial adjudicator, be it judge or jury,' is a right 'so basic to a fair trial that [its] infraction can never

**27.** Francolino argues that he does not demand that judicial assignments be done randomly *per se,* only that they be done in a way which does not infringe upon his due process rights (i.e., that the judicial assignment process remain free of prosecutorial influence). However, the *Gallo* court was cognizant of the defendant's due process concerns but nonetheless mandated that he make a showing of prejudice.

**28.** The facts in *Cruz* are somewhat different, insofar as *Cruz* involved a judicial assignment system in which the Presiding Judge of the Superior Court of Guam selected the judge who would preside over each case. The basic underlying argument in *Cruz,* however, was similar to the one being made by Francolino; namely, that the assignment system was being manipulated to help the prosecution and hurt the defense.

be treated as harmless error.'" Motion Brief, at 18 (quoting *Gray*, 481 U.S. at 668, 107 S.Ct. 2045). The problem with Francolino's argument is that it conflates the appearance of partiality with actual partiality. Francolino is correct when he argues that he has a fundamental right to an impartial adjudicator. If Francolino is able to prove that he did not have an impartial adjudicator, habeas corpus relief is appropriate. However, Francolino asks the Court to presume that Justice Snyder was partial because she was selected by the prosecution. As noted *supra*, however, Francolino never alleges any type of causality–i.e., that judge-shopping caused Justice Snyder's partiality. In the absence of causation, Francolino must show that Justice Snyder was nevertheless partial–in other words, he must show actual prejudice. While the Court agrees that the former system gave the appearance of partiality, maintaining that Justice Snyder was in fact partial is a separate matter. Moreover *Gray* cites *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which in turn cites *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) for the proposition that a violation of the right to an impartial judge is *per se* reversible error. However, the facts in *Tumey* are not analogous to those at issue here. *Tumey* involved a rather unusual statute providing that the mayor of a village would preside over the trial of one accused of violating the anti-alcohol Prohibition statutes. The problem with the system, according to the Supreme Court, was that there was "no way by which the mayor may be paid for his service as judge, if he does not convict those who are brought before him." *Tumey*, 273 U.S. at 520, 47 S.Ct. 437. Thus, the referenced Supreme Court language is predicated not on the mere appearance of partiality but on a system that structurally gave the mayor/judge an economic incen-

tive to convict the accused (indeed, remuneration was conditioned on a conviction). Such a system, which gave the judge an economic stake in the outcome of the trial, was plainly unconstitutional. In contrast, here Francolino makes no allegation that Justice Snyder had any direct stake in the outcome of his trial.

Similarly, Francolino cites *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) for the proposition that the Due Process Clause "entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." Motion Brief, at 19 (citing *id.* at 242, 100 S.Ct. 1610). However, *Marshall* itself rejected a finding of improper partiality in part because, as in the instant case, "[n]o governmental official stands to profit economically [ ... ]." *Id.* at 250, 100 S.Ct. 1610. Moreover, the cases cited in *Marshall* that upheld reversal for partiality all involve instances where the actor in question had an extrinsic, often pecuniary interest, in the outcome of a case. *See id.* at 243 n. 2, 100 S.Ct. 1610 (citing *Connally v. Georgia*, 429 U.S. 245, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977) (invalidating a system in which justices of the peace were paid for issuance but not for nonissuance of search warrants); *Gibson v. Berryhill*, 411 U.S. 564, 578–579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (prohibiting a state administrative board consisting of optometrists in private practice from hearing charges filed against licensed optometrists competing with board members); *Taylor v. Hayes*, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974) (prohibiting the trial of a defendant before a judge who has previously held the defendant in contempt); *Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971) (same); *Morrissey v. Brewer*, 408 U.S. 471, 485–486, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (prohibiting a parole officer from making the determina-

tion whether reasonable grounds exist for the revocation of parole)).

■■■■ The apparent touchstone with regard to the Supreme Court's partiality analysis is whether the basis of partiality is extrinsic or intrinsic. An extrinsic basis of partiality means that an outside factor affects the basic architecture of the judicial system in such a way as to influence the results. Such an extrinsic basis of partiality exists, for example, as noted *supra*, where the judge has a vested economic interest in the outcome of a trial or hearing. An intrinsic basis of partiality implicates the judge herself, without regard to extrinsic factors. An intrinsic basis of partiality exists, for example, where the judge is biased in favor of one side or the other without reference to an external interest. The Supreme Court precedent cited by Francolino suggests that while a *per se* rule of reversal may apply in the case of an extrinsic basis of partiality, a showing of prejudice is required where the alleged basis of partiality is intrinsic.

In the instant case, Francolino argues that Justice Snyder's basis of partiality is intrinsic. Francolino does not suggest that Justice Snyder has an economic or other external motive that drives her to be pro-prosecution. He merely argues that she harbors a deep-seated, but internal, pro-prosecution bias.[29] Such an intrinsic basis of partiality may provide grounds for habeas corpus relief, but only if the accused suffers actual prejudice. In the absence of actual prejudice, habeas corpus relief is not appropriate–prejudice cannot be presumed in such a case.

Francolino's reliance on *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), and *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955) is similarly misplaced; these cases each deal with *per se* prejudice in settings wholly different from the one at issue here (*Strickland* and *Cronic* concern the ineffective assistance of counsel, whereas *Murchison* concerns a contempt proceeding before a single judge sitting as a "one-man grand jury"). The Court is of the view that certain violations of a defendant's constitutional rights are grounds for relief even absent a showing of actual prejudice. This does not vitiate, however, the fact that a showing of actual prejudice is required in this particular instance. After having reviewed the parties' submissions and the relevant case law, the Court concludes that in the instant case, habeas corpus relief is not appropriate absent a showing by Francolino of actual prejudice.

### 4. Francolino Did Not Suffer Actual Prejudice

#### a. Standards

This Court, having determined that the state court had not adjudicated the issue as to whether a showing of actual prejudice is required, addressed this issue *de novo*. The issue as to whether Francolino did, in fact, suffer actual prejudice was clearly addressed by the Appellate Division. *See People v. Association of Trade Waste Removers of Greater New York*, 267 A.D.2d 137, 701 N.Y.S.2d 12 (1st Dep't 1999).[30] Because the state court ad-

---

**29.** The only allegation made by Francolino that approximates an extrinsic basis of partiality is his mention of the fact that Snyder admits that she would be interested in running for District Attorney. However, Francolino does not allege that this is the basis for her

alleged pro-prosecution bias, and fails to develop this argument to the extent necessary to overcome the presumption that judges are impartial and unbiased.

**30.** The Appellate Division noted that the claims relating to Justice Snyder's overall

dressed these claims, such adjudication may not be upset unless it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under Second Circuit precedent, the issue is "not whether the state court was incorrect or erroneous" in rejecting Francolino's claims, but whether it was "objectively unreasonable" in doing so. *Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir.2001). In the instant case, however, this Court concurs with the decision of the Appellate Division as to the issue of prejudice. Parenthetically, under AEDPA, even incorrect decisions must stand unless they are "contrary to" or involve an "unreasonable application of, clearly established Federal law."

■ With regard to alleged judicial bias, the role of an appellate federal court reviewing a decision of another federal court may be distinguished from the role of a federal habeas corpus court reviewing a state court conviction. Both Francolino and respondents agree that the relevant standard-setting case is *Daye v. Attorney General*, 712 F.2d 1566 (2d Cir.1983). *See* Opposition Brief, at 30; Reply Brief, at 32. The *Daye* court noted that there are two separate standards at issue: federal standards of judicial propriety and standards of fundamental fairness required by the Constitution. *See Daye*, at 1571. While federal appellate courts reviewing federal trials may apply the former standard, federal habeas corpus courts reviewing state convictions may not. Rather, the Second Circuit noted that "an important facet of

federalism" is that "federal courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts and lack such authority with respect to state courts." *Id.* at 1571. Thus, the fact that a state court judge's behavior might have exceeded federal standards of judicial propriety is irrelevant on a habeas corpus motion, so long as the behavior does not violate the Constitution. *See id* at 1571.

■ With regard to the instant case, the question is not whether Justice Snyder's actions violated federal standards of judicial propriety but whether they violated the Constitution. This Constitution-based threshold is relatively high, as the *Daye* court noted: "A trial judge's intervention in the conduct of a criminal trial would have to reach a *significant extent* and be adverse to the defendant to a *substantial degree* before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits." *Daye*, 712 F.2d at 1572. In the instant case, during the grueling eight-month trial, Justice Snyder made some ill-advised remarks at various times. While such remarks may have violated federal standards of judicial propriety, for the reasons set forth below, none of her remarks, either singly or collectively, violated the Constitution or prejudiced Francolino so as to warrant habeas corpus relief.

Given the extraordinary length of the trial and resulting transcript, conducting a complete analysis of every page of the record would be a Herculean task. In-

conduct of the trial were not preserved and declined to review them in the interest of justice. The Appellate Division added, however, that "[w]ere we to review these claims, we would find that the court's questioning of witnesses was not overly intrusive [ ... ]." *People v. Association of Trade Waste Removers*

*of Greater New York*, 267 A.D.2d 137, 701 N.Y.S.2d 12, 16 (1st Dep't 1999). The Court will treat the issue of Justice Snyder's questioning of witnesses as though it had been reviewed and upheld by the Appellate Division.

stead, the Court reviews the instances singled out and highlighted by Francolino in his Motion Brief, on the well-founded assumption that the examples he cites are the most "flagrant" or "clear-cut" examples of Justice Snyder's alleged bias.

### b. Francolino Was Not "Stripped" of his Right to a Bench Trial

■ Francolino argues that he was prejudiced by Justice Snyder's alleged bias because he was "stripped of his statutory right to choose between a bench or jury trial." Motion Brief, at 30. While he never actually forfeited his right to a bench trial under N.Y.Crim. Proc. Law § 320.10 (McKinney 2002), Francolino reasons that "a defendant would be loath to exercise that right where, as here, the prosecutor brings about the selection of the judge." [31] Motion Brief, at 30. However, Francolino fails to explain how his position was materially worsened by virtue of the prosecutor's selection. Specifically, Francolino's fear of a bench trial would seemingly have been present even if he had randomly been assigned Justice Snyder, given her alleged pro-prosecution reputation. Moreover, Francolino's argument is circular. He postulates that Justice Snyder (by virtue of the fact that she was chosen by the prosecution) would be prejudiced against him. Based on that assumption, he states that he effectively lost his right to a bench trial (and thereby suffered prejudice) be-

cause of the *in terrorem* effect of his original assumption of prejudice. In other words, by postulating that he would be prejudiced, Francolino, without more, alleges that he was prejudiced. [32]

### c. Francolino Was Not Prejudiced During his Arraignment

■ Francolino argues that several statements made by Justice Snyder during the arraignment revealed that her "extensive involvement during the investigative stages of the case irredeemably prejudiced her against the defendants." Motion Brief, at 31. [33] These statements include the following:

"I do have some familiarity with the case because I was the judge who signed some of the wire taps and search warrants, all of the search warrants." [34]

"The evidence against [co-defendant] Mr. Giovinco is very, very serious in this case, since I am familiar with not all of it, but certainly some of it, I think a bail in the amount of $250,000 is reasonable [ ... ]" [35]

"I did not go into detail the extent [sic] of evidence against your client, obviously, that has weighed heavily in my decision." [36]

"I don't want to try this case now. I am amazed you could demean the extent of the evidence in this case, given the massive encompassed [sic] nature of this indict-

---

31. Both Francolino and respondents incorrectly cite the relevant statute as § 310.20.

32. Respondents' argument, that Justice Snyder would have "undoubtedly" recused herself if Francolino had desired a bench trial, is purely speculative. Opposition Brief, at 32.

33. Francolino does not contend that his trial was prejudiced by virtue of Justice Snyder's statements at the arraignment; rather, he argues that her statements during the arraignment reflected a pre-existing pro-prosecution bias.

34. (Arraignment Transcript, June 22, 1995 ("Arr.Tr."), at 12, annexed as Ex. F of Notice of Motion and Affirmation submitted by The Association of Trade Waste Removers of Greater New York, Inc., dated February 16, 1996).

35. Arr. Tr., at 16.

36. Arr. Tr., at 26.

ment, the extent of the wiretaps evidence [ ... ]." [37]

"In view of all of the evidence in this case with which you're not yet familiar, that is perhaps–will become clear to you later on, I am familiar with the part of it, my role previously in this case [sic]. I am ready to proceed to set bail unless you have anything to add. I will not demean the extent or all[-]encompassing nature of this [ ... ] indictment." [38]

"You claim [Francolino] has–I am not interested in that. I am familiar with this investigation. You may have heard me say I supervised some of the wiretaps. I signed all of the search warrants. Obviously, after reading them carefully–." [39]

The Court finds that none of the above statements, either individually or combined, revealed any improper bias. The arraigning court is not only permitted to weigh the evidence against a defendant–it is required to do so:

2. To the extent that the issuance of an order of recognizance or bail and the terms thereof are matters of discretion rather than of law, an application is determined on the basis of the following factors and criteria: (a) With respect to any principal, the court must consider the kind and degree of control or restriction that is necessary to secure his court attendance when required. In determining that matter, the court *must*, on the basis of available information, consider and take into account:

[ ... ]

(vii) If he is a defendant, the weight of the evidence against him in the pending criminal action and any other factor indicating probability or improbability of conviction; or, in the case of an applica-

tion for bail or recognizance pending appeal, the merit or lack of merit of the appeal [ ... ]

N.Y.Crim. Proc. Law § 510.30 (emphasis added). The fact that some of this information was gleaned from Justice Snyder's involvement in authorizing the wiretaps and search warrants is irrelevant because Francolino does not challenge here the practice of having the judge who authorized search warrants and wiretaps preside over the arraignment. In the absence of such a challenge, Francolino must show that he was actually prejudiced by Justice Snyder's actions or statements. He fails to make such a showing for two reasons. First, as noted above, Justice Snyder had a duty to consider the weight of the evidence to make a fair bail determination. Second, Justice Snyder did not set an excessive bail. The government asked for $250,000 bail; Francolino's attorney asked for $150,000. *See* Arr. Tr., at 127, 133. Justice Snyder split the difference and set bail at $200,000. *See id.* at 133. While the amount of bail might have been higher than Francolino had hoped, it was less than what the government sought and was certainly reasonable. In sum, neither Justice Snyder's words nor actions during the arraignment revealed any bias against Francolino nor prejudiced him in any way.

In addition to the above statements which demonstrate that Justice Snyder was (permissibly) influenced by her participation in authorizing wiretaps and search warrants, Francolino objects to Justice Snyder's comment that, "if the charges are proven, it will change the practices of the entire industry and the People are charging the massive overpricing and price fixing in this case will result in millions of dollars savings [sic] to companies and con-

---

**37.** Arr. Tr., at 33.

**38.** Arr. Tr., at 33.

**39.** Arr. Tr., at 129.

sumers if these charges are proven." Arr. Tr., at 34. Francolino contends that this statement echoed comments expressed by the District Attorney in his press release announcing the indictment. *See* Motion Brief, at 3. While the Court agrees that this comment was not directly relevant to the matter of setting bail, the statement did not reveal any bias against Francolino– it merely placed his indictment in context. Likewise, for the reasons set forth in the previous paragraph, Francolino was not prejudiced by Justice Snyder's statement.

### d. Francolino Was Not Prejudiced by Justice Snyder's Pretrial Rulings

 Francolino claims that he was prejudiced by Justice Snyder's pretrial rulings. *See* Motion Brief, at 32. However, Francolino never examines the specific rulings, but merely states that "virtually all" pretrial and *in limine* motions were decided in the prosecution's favor. In the absence of any specificity or legal analysis, this Court cannot entertain Francolino's claim. Moreover, " 'judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.' " *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir.1999). *See also United States v. Pisani,* 773 F.2d 397, 402 (2d Cir.1985) (noting that a "trial judge must rule on countless objections, and a simple numerical tally of those sustained and overruled, one which here favors the government, is not enough to establish that the scales of justice were tipped against a defendant"). Francolino never explains how Justice Snyder's alleged bias influenced her rulings, or even directly argues that her rulings were unsound.

Additionally, Francolino objects to the fact that Justice Snyder required Francolino to "make offers of proof as a condition precedent to advancing virtually any theory of defense at trial, regardless of wheth-er a given defense would be supported by evidence introduced by the prosecution itself or through cross-examination." Motion Brief, at 32. Francolino again fails to explain precisely why Justice Snyder's ruling was supposedly in error. Moreover, any incorrect ruling made by Justice Snyder was reviewable upon appeal. In fact, the Appellate Division affirmed Justice Snyder's ruling on this issue:

> The trial court properly required defendants to make a good faith offer of proof concerning certain proposed defenses, and the conditions that the court required defendants to meet in connection with such defenses were reasonable, because the proposed defenses were extremely far-fetched and the court's restrictions were necessary in order to prevent the jury from being confused and misled. The court properly allowed defendants to argue to the jury concerning facts in evidence.

*People v. Association of Trade Waste Removers of Greater New York,* 267 A.D.2d 137, 701 N.Y.S.2d 12, 15 (1st Dep't 1999).

### e. Francolino Was Not Prejudiced by Justice Snyder's Supervision of the Trial

#### i. Generally

 Before citing concrete examples of Justice Snyder's alleged bias, Francolino asserts that Justice Snyder possessed a "deep-seated allegiance to the District Attorney's cause and an antagonism to defendants' throughout the proceedings," and that she "exhibited, frequently in front of the jury, pro-prosecution bias and marked antipathy toward the defendants, their counsel and their cause." Motion Brief, at 33. While, as noted above, Justice Snyder did make several ill-advised remarks during the trial, the record, taken as a whole, reveals rather few examples of her sup-

posed bias over the course of nearly 14,000 pages of trial transcript. For example, as respondents point out, Francolino does not cite a single example of allegedly biased behavior on the part of Justice Snyder for the first 5,600 pages of the trial transcript. Moreover, as described in detail below, the various occasions singled out by Francolino for inclusion in his brief are not particularly egregious. The Appellate Division noted this: "the court's questioning of witnesses was not overly intrusive, and its rulings and comments did not prejudice defendants, particularly in light of the few cited instances and the length of the trial." *People v. Association of Trade Waste Removers of Greater New York,* 267 A.D.2d 137, 701 N.Y.S.2d 12, 16 (1st Dep't 1999). As noted *supra,* this determination is entitled to deference under the habeas standards set forth in the AEDPA statute.

Respondents argue that the fact that Justice Snyder ruled in favor of the prosecution more frequently than she did for the defense is irrelevant absent "any objective indication that [her rulings] were erroneous or decided in a manner less 'favorable' than would have been by another judge." Opposition Brief, at 35. Francolino contends that this argument, among others, "misses the point completely," because such an analysis ignores the "record-dampening" effect of the underlying prosecutorial judge-shopping and Justice Snyder's alleged pro-prosecution bias. Reply Brief, at 34. The Court does not agree with Francolino's assessment. While it is impossible for a reviewing court to "glean a judge's tone from the cold record," this is true in any appeal, irrespective of the allegation of bias. Reply Brief, at 33 n.8 (citing Opposition Brief, at 53). Where the

record reveals an erroneous decision, a reviewing court may decide to reverse it. Francolino's argument posits, however, the existence of errors so minute they cannot be determined by reference to the record– "subtle unfairnesses not readily apparent in the cold record and not readily subject to appellate review, or not constituting reversible errors or even appealable issues in their own right." With this sweeping statement, Francolino indicts not merely the actions of Justice Snyder, but the very process of appellate review itself. Under Francolino's logic, a reviewing court should reverse a trial court decision even where no error can be detected, on the mere allegation by the petitioner that "record dampening" occurred. This is a reprise of Francolino's earlier argument that prosecutorial judge-shopping mandates reversal, a contention already rejected by this Court.

Francolino notes that the primary prosecution witness, the undercover detective, testified for twenty-three days on direct examination.[40] *See* Motion Brief, at 34. While in many circumstances this would be unusual, given the lengthy, multi-year investigation conducted by the government, the mere length of the direct examination does not provide support for the contention that Justice Snyder was biased. In addition, the cross-examination of the witness by defense counsel spanned nearly 1,500 pages. *See* Opposition Brief, at 38. While Francolino argues that Justice Snyder made incorrect rulings during cross-examination, he does not argue that she prematurely cut off his cross-examination. On this basis, the length of the direct examination does not reveal any bias, nor

---

**40.** Francolino also argues that during the cross-examination of the undercover detective, Justice Snyder incorrectly sustained the government's objections and made disparag-

ing remarks about Francolino and his counsel before the jury. This allegation is examined *infra.*

was Francolino prejudiced by such examination.

### ii. Justice Snyder's "Threats"

Francolino alleges that several of Justice Snyder's remarks amounted to thinly-veiled threats, creating a climate of fear for Francolino and the other defendants. The record necessarily "cannot reflect the questions *unasked* and the arguments *not* made by defense counsel because of the unquestionable *in terrorem* effect of the court's warnings and invective." Motion Brief, at 33. Francolino cites one occasion on which Justice Snyder told defense counsel that "I will do things that you won't like when you treat me in a way I don't like," Trial Tr., at 6262. In order to appreciate Justice Snyder's comments, however, the colloquy must be examined in context. The above statement was made shortly after a particularly heated exchange between Justice Snyder and Mr. White, Francolino's attorney:

> **Mr. Dugan (Prosecutor):** Did you learn whether or not there was any questioning of Joe Benedetto as to whether you were an F.B.I. agent?
>
> **Mr. White:** Objection.
>
> **Mr. Futerfas:** Objection.
>
> **Mr. Spund:** Objection.
>
> **The Court:** Your identity was questioned; is that right[?]
>
> **The Witness:** It was question[ed]; yes.
>
> **The Court:** It was questioned in terms of you possibly being a member of law enforcement?
>
> **Mr. Futerfas:** Your honor, we have a continuing objection.
>
> **The Court:** We did this at sidebar. You know my rules. Please stop.
>
> **Mr. White:** Objection to the Court's question.
>
> **The Court:** There is no need to go on further and further in front of the jury.

> **Mr. White:** Objection to that.
>
> **The Court:** I'll deal with that in a few minutes. Please, try to be professional and courteous.
>
> **Mr. White:** Objection, your Honor.
>
> **The Court:** Well. You can answer my question.
>
> **The Witness:** Yes. It was mentioned that it was asked if I was an F.B.I. agent.

Trial Tr., at 6252–53. After the jury was dismissed, Justice Snyder reprimanded the prosecutor for soliciting hearsay testimony. *See* Trial Tr., at 6261–62. Thereafter, she addressed defense counsel:

> Now to defense counsel. I don't think there's any need to be rude and I can tell you I'm not going to put up with it. When you get into cross, there is going to be, probably, a lot of argument between us and I expect a calm, courteous and professional response. If I don't get it, I'm going to interrupt your cross by sending the jury out of this courtroom on every occasion. I've done it before and you're not going to like it. Remember, *I will do things that you won't like when you treat me in a way I don't like.* You can object calmly and professionally. If you don't do it, then you'll just have to put up with how I decide I'm going to conduct things.

Trial Tr., at 6262. Thereafter, Justice Snyder reiterated that most counsel had objected in a rude manner and that Mr. White "in fact, gave a surplus, extra, repeated objection in a loud voice and he did it on purpose because he wants to engage in this kind of–." Trial Tr., at 6267.

While Justice Snyder's statements were less than tactful, her comments were directed not at the fact that defense counsel were objecting but at the manner in which they were objecting. After having reviewed the transcript, the Court finds that

Justice Snyder's remarks, in this and other instances,[41] though blunt, were not inappropriate and did not prejudice Francolino. As the Supreme Court has noted: "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as [ ... ] judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Liteky v. United States,* 510 U.S. 540, 555–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Where the Second Circuit has ordered a new trial based on judicial threats against attorneys, the actions have been most draconian. *See, e.g., United States v. Edwardo–Franco,* 885 F.2d 1002, 1007–08 (2d Cir.1989) (court twice held defense counsel in contempt, once for grimacing at an unfavorable ruling).

### iii. Justice Snyder's Remarks

Francolino argues that Justice Snyder made a number of remarks, certain of them in front of the jury, that disparaged him and his attorney. These remarks, he argues, violated his rights under the Due Process Clause. A close reading of the various instances cited by Francolino reveals that no such due process violation occurred. However, the Court acknowledges that during the course of the eight-month trial, Justice Snyder made a number of questionable remarks. However, "taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and ... the Constitution does not guarantee such a trial." *United States v. Lane,* 474 U.S. 438, 445, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986).

Francolino objects, for example, to Justice Snyder's "gratuitous[ ] attack[ ]" on defense counsel's opening statement more than a month after the opening:

**Q.:** Garbage removers require a license to remove that type of waste; correct?

**Prosecutor:** Objection

**The Court:** Well, I'm listening very carefully to where this is going. In Mr. White's opening we had heard a dissertation about various aspects of the garbage business and numerous other things which are totally irrelevant to this case. I'll be charging you about that at the end. You will not hear many of the things during cross or in summation that you heard in openings. I think that will become clear to you. So, put that out of your mind. I'll allow a limited number of questions.

**Mr. White:** I object to that, your Honor.

**The Court:** I'm sure you do.

Trial Tr., at 8167–68. The Court agrees that Justice Snyder chose an inopportune moment to critique the opening statement, and that her characterization of the opening statement as a "dissertation" was also inappropriate. Nevertheless, Justice Snyder was within her rights as judge to instruct the jury on the law. It is unquestionably the province of the presiding judge to make determinations of relevance. In this case, while the form of Justice Snyder's comments leaves something to be desired, the statement itself was not improper.

Similarly, Francolino objects to the fact that Justice Snyder treated defense questions as "presumptively irrelevant" and that she "made negative comments in front of the jury, before ascertaining at sidebar that defense counsels' [sic] questions were

---

**41.** *See, e.g.,* Trial Tr., at 6358.

relevant." Motion Brief, at 34. Francolino cites the following exchange:

> **Q.:** And you said there were a number of different unions. Aren't the people who man trucks with Class One licenses, aren't they in Local 813?
>
> **Mr. Dugan [Prosecutor]:** Objection.
>
> **The Court:** Sustained unless you could show me at the sidebar that there's some relevance to this. See, the focus of this trial is on the conduct of the defendants and whether the prosecution can prove by proof beyond a reasonable doubt whether they committed any of the crimes with which they're charged. I just want you to keep that in mind because that is the focus of this trial. Now, there's plenty of evidence that doesn't immediately answer that question which is relevant. There's a great deal which is not. Part of my job is to make sure that you hear mostly, if not exclusively, relevant evidence. At this point we'll have a sidebar.

Trial Tr., at 8169–70. While perhaps Justice Snyder should simply have had the sidebar without giving the jury an off-the-cuff explanation of relevance, nothing that Justice Snyder said was inappropriate. Indeed, following a lengthy sidebar, Justice Snyder overruled the government's objection. *See id.* at 8179. During the sidebar itself, and outside of the presence of the jury, Justice Snyder explained her anger regarding Mr. White's opening statement:

> **The Court:** Here I am arguing to the jury–I mean, not–strike the word "arguing." Here I am–
>
> **Mr. White:** No, no. Leave that in.
>
> **Mr. Futerfas:** Freudian.
>
> **The Court:** Here I am opining is the word I think that I sought to the jury, which I very strongly believe, which is that Mr. White's opening was ridiculous. I should strike it. It violated every rule

imaginable. Of course, you [the government] didn't object. So, don't start me on that. In any event, it's not going to happen.

> **Mr. Dugan [Prosecutor]:** It wasn't evidence. That's why we didn't object.
>
> **The Court:** I don't understand that. I'll never understand it. I don't want to hear about it.
>
> **Mr. Dugan:** We wanted to know what the defense was.
>
> **The Court:** Well, I'm sorry. I don't accept that. But in any event, be that as it may, that's over with.
>
> [ . . . ]
>
> **Mr. Futerfas:** Judge we just are concerned with the instructions. We object to them.
>
> **The Court:** I'm sure you do. I'll tell you something: I don't think there's anyway [sic] to say anything. The truth is that this jury heard all sorts of things it shouldn't have heard. Frankly, I'm just as angry with the prosecution for not objecting to it on the opening. I already said that.
>
> **Mr. Futerfas:** The problem is: such a broad statement, your Honor, right after I finished my cross-examination casts a pall on all the defendants at the table. It was a very broad, very strong instruction. I request–we object to it first of all and I request that the Court in some way try to modify it to the jury.
>
> **The Court:** Not at this point. We'll see what I will try to do if I feel Mr. White is making an effort. Maybe sometimes I won't understand what you're doing. You'll have to explain it to me.
>
> **Mr. White:** I would like you to do that before you talk to the jury.

Trial Tr., 8174–75; 8177–78. Leaving Justice Snyder's "Freudian" slip aside, the presiding judge is undoubtedly entitled to

criticize a party's opening statement if the judge believes that the opening statement violated a previous *in limine* ruling. As the Supreme Court noted, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Additionally, the Supreme Court has apparently embraced a stringent test for showing bias. An example of impermissible bias would be the statement that, with respect to German Americans, "their hearts are reeking with disloyalty." *Id.* at 555, 114 S.Ct. 1147 (citation omitted). The comments at issue here are not nearly so extreme.

In this case, Justice Snyder's comments were directed not at Mr. White personally but at his allegedly inappropriate opening statement. While many judges would not have decided to vent their anger at an opening statement many weeks after the fact, Justice Snyder's actions were not inappropriate, much less unconstitutional. Francolino accuses Justice Snyder of undercutting various defense arguments. For example, she allegedly undercut an argument by Francolino which attempted to show that the discontinuance of carting service by one carting company cooperating with the government's investigation was orchestrated by investigators, not by defendants:

> [**Defense Counsel**]: Did you participate any time during–well, in 1994, did you participate in any discussions with Sal Benedetto and Assistant District Attorneys regarding BFI's relationship with Chambers?

[**Prosecutor**]: Objection

**The Court:** BFI's not on trial here despite all these questions. I want you to keep that in mind. The defendants are on trial. It is up to the Prosecution to prove their guilt if they are able to do so as to each one considered separately by proof beyond a reasonable doubt. Sustained.

**Mr. White:** I object to the Court's instruction, your Honor.

Trial Tr., at 8355–56. While Francolino may not have liked what Justice Snyder said, her intervention was not improper. The trial judge is obligated to keep the trial on track and ensure that the evidence presented is admissible. Indeed, Mr. White argued during his opening statement that the defendant carters were merely "little guys," desperately seeking to fend off BFI, the "out-of-town corporate giant" with a criminal record which was threatening to destroy the local, home-grown carters. *See* Trial Tr., at 2256–66.[42] The above statement to the jury was made to explain (perhaps superfluously) why she had decided to sustain the government's objection. While other judges might not have spoken to the jury on this point, Justice Snyder's actions were not inappropriate nor prejudicial. Moreover, as noted above, the Appellate Division held that Justice Snyder's comments did not prejudice Francolino. Nothing indicates, nor does Francolino assert, that its ruling was not based on sound precedent.

Francolino next attacks Justice Snyder's statement to one defense counsel that his "team" was calling. Trial Tr., at 7547. Francolino argues that this remark was

---

42. Understandably, Justice Snyder was deeply troubled by what she considered to be a wholly improper argument by Mr. White. As she noted, "it reminds me very much of, my early experience in trial work in rape. You know, try–put the victim on trial. [ ... ] The law now says that's not right in rape cases [ ... ] There's no such law about carters." Trial Tr., at 2268–69.

prejudicial because the various individual defendants were represented by separate attorneys. In the jury's mind, alleges Francolino, Justice Snyder's statement could be read to suggest that all defendants were effectively represented by a single attorney, or that all defendants were linked. *See* Motion Brief, at 38. As a preliminary matter, no defense counsel objected to Justice Snyder's "team" statement at the time; accordingly, the issue was not preserved for appeal. Regardless, this off-hand comment, although ill-advised, was harmless, as the defense attorneys in the case frequently acted in unison (as when objecting to testimony).

Francolino also objects to Justice Snyder's reprimand of Mr. Futerfas, defendant Malangone's attorney. In the presence of the jury, she stated that "[y]ou have violated about 20 rules of evidence thus far in your cross-examination. You look very happy about it." Trial Tr., at 7934–35. As with the "team" comment, none of the attorneys objected to Justice Snyder's remark. Additionally, the remark was directed at the attorney representing another defendant, not Francolino. Finally, Justice Snyder's exclamation was in response to the fact that Mr. Futerfas had read sections of a document that had not been admitted into evidence. While Justice Snyder's remark was likely hyperbolic, it was not inappropriate and did not demonstrate bias; nor did it prejudice Francolino.

Another remark made by Justice Snyder and objected to by Francolino was her characterization of Francolino as a "prima donna." Trial Tr., at 10805. As in other instances, however, context is key. First, the comment was made outside the presence of the jury. Second, the remarks related to Francolino's potential unavailability in court because of his decision to "go away for several days." Trial Tr., at 10804. While Justice Snyder need not have called Francolino a "prima donna," she was understandably angered at the prospect of altering the trial schedule to fit the defendant's schedule. As she noted, "I know a good place where I don't have to worry about his schedule at all." Trial Tr., at 10805. While Justice Snyder's words were unnecessary, they betrayed her frustration with Francolino's decision to travel during his trial, not her personal antipathy towards him.

Francolino also objects to Justice Snyder's comment, outside the hearing of the jury, on the credibility of certain witnesses:

**Mr. Futerfas:** Now the reason I asked for a sidebar is because the People–I think it was with respect to the witness Markenstein of Guttman–

**The Court:** The honest witness.

**Mr. Futerfas:** I think this witness is being honest.

**The Court:** I don't think so. I think this witness has been evasive and is full of bologna.

**Mr. Fischetti:** I don't.

**The Court:** I'm giving you my opinion as a Judge. You give your opinion as a Defense Attorney. Neither of our opinions is the least bit relevant. I can't help myself. I hate to see a witness who has been made afraid to tell the truth. That is my opinion.

**Mr. Fischetti:** I object to that statement.

**The Court:** This is out of the jury's presence. It shows my opinion of this witness.

**Mr. Fischetti:** There is no evidence of that. I object to this statement.

**The Court:** It is replete with mob intimidation.

**Mr. Fischetti:** It is not.

Trial Tr., at 9103–04. The Court recognizes that judges may not comment on the credibility of witnesses before the jury. *See, e.g., Quercia v. United States,* 289 U.S. 466, 468, 53 S.Ct. 698, 77 L.Ed. 1321 (1933) (reversing conviction where the judge charged the jury that "I think that every single word that man said, except when he agreed with the Government's testimony, was a lie"). Francolino does not explain how the judge's personal feelings regarding the credibility of a certain witness, which were never shared with the jury, prejudiced him in any way. Moreover, as the Supreme Court has noted, "[i]mpartiality is not gullibility" or "child-like innocence." *Liteky v. United States,* 510 U.S. 540, 552, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). While Justice Snyder would have been decorous had she kept her opinion of the witness to herself, her statement at a sidebar discussion did not reveal any bias and was not prejudicial to Francolino.

### iv. Justice Snyder's Questions

 In addition to her allegedly improper remarks, Francolino argues that Justice Snyder asked several questions calculated to bolster the prosecution and hurt the defense. As a general matter, a judge may question witnesses *sua sponte:* "[i]t is clear that a judge does not deny a defendant due process of law by merely intervening in a trial to question witnesses." *Gayle v. Scully,* 779 F.2d 802, 806 (2d Cir.1985). Only "infrequently" does intervention by a trial judge rise to the level of a due process violation. *Id.* at 806. Respondents argue that Francolino cites relatively few examples of such alleg-

edly pernicious *sua sponte* questioning by the court, and claim that the relatively low number of questions should weigh heavily in this Court's determination of whether the questioning constituted a due process violation. While the Court notes Francolino's citation of relatively few instances of prejudicial *sua sponte* questioning by Justice Snyder, this fact holds little weight, as " '[t]he influence of the trial judge is necessarily and properly of great weight' and the jurors are ever watchful of the words that fall from him. Particularly in a criminal trial, the judge's last word is apt to be the decisive word." *Bollenbach v. United States,* 326 U.S. 607, 612, 66 S.Ct. 402, 90 L.Ed. 350 (1946) (citation omitted).[43]

Francolino argues, for example, that when an F.B.I. agent testified that certain conversations between the undercover detective and defendants were either not recorded or inaudible due to transmitter problems, and Francolino's counsel suggested through his questions that these conversations may have been deliberately garbled or not recorded by the undercover officer, Justice Snyder erroneously interjected:

> **The Court:** Well, I hate to disappoint you and indicate that we have to stop now. But we do. So, this is going to be continued on Monday. I'm sorry for any inconvenience to you. I just want to ask you one question though before we end. Regardless of what would be the ideal equipment, isn't the primary concern of any law enforcement operation based on your experience the safety of the undercover [officer]?

---

**43.** While *Bollenbach* concerned a jury-charge, its dictum about the judge's influence is equally applicable with regard to allegedly partisan *sua sponte* questioning of witnesses. The litany of cases cited by respondents are merely examples of more egregious cases of judicial questioning. Certainly the number of intrusions is relevant, but respondents' cases do not suggest that a single instance of improper judicial questioning, if prejudicial enough, might not warrant reversal.

**The Witness:** That would be a primary concern.

**The Court:** Thank you. You're excused until Monday at 10 o'clock.

Trial Tr., at 3209–10. Francolino argues that the *sua sponte* question by the court was leading and was designed to elicit testimony favorable to the prosecution; namely, that the undercover detective in this case worked at risk to his safety.[44] *See* Motion Brief, at 39. The Appellate Division found that Justice Snyder's "questioning of witnesses was not overly intrusive." *People v. Association of Trade Waste Removers of Greater New York,* 267 A.D.2d 137, 701 N.Y.S.2d 12 (1st Dep't 1999). Francolino cites no precedent (much less Supreme Court precedent) stating that a question like the one posed by Justice Snyder is *per se* prejudicial or grounds for reversal. While this Court holds that this particular instance of *sua sponte* questioning was leading and inappropriate, nothing suggests that the Appellate Division's holding was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254:. The fact that the Appellate Division may have been incorrect is irrelevant. Regardless, the Court finds that the question (and the elicited response) was not sufficiently prejudicial to warrant habeas corpus relief.[45]

Francolino also points to instances when Justice Snyder allegedly attempted to rehabilitate a prosecution witness whose testimony had been undermined on cross-examination. One example cited by Francolino concerns cross-examination of the undercover detective regarding a transcript he made of taped conversations. In one instance, the undercover detective appeared to erroneously attribute a statement to Francolino that in fact had been made by a codefendant. Justice Snyder then *sua sponte* attempted to prop up the witness's testimony:

**The Court:** Let's proceed. Actually, you did make a number of mistakes, despite your best efforts not to make one?

**The Witness:** Yes.

**Mr. Fischetti:** May the jury–

**The Court:** Would you like to interrupt me? I know you do.

**Mr. Fischetti:** I thought you finished.

**The Court:** No, you don't like my questions? In fact, you pointed out one of them yesterday. You believe that the transcript was inaccurate, where you thought it said customer and not trust him [sic], in terms of Joe Francolino. That was one?

**The Witness:** Yes.

**The Court:** In fact, when you listened to a lot of these tapes and you look at the transcript, don't you sometimes hear words where it says unintelligible or inaudible?

**The Witness:** Yes.

**The Court:** So being a human being, your job wasn't a hundred percent?

**The Witness:** It is not, no.

**The Court:** Now, let's try to go on. I'm sure you [defense counsel] enjoyed that very much by the look on your face.

Trial Tr., at 7828–29. As in the previous instance, the trial court injected itself into the cross-examination and asked several leading questions that were designed, it appears, to bolster the credibility of the

---

**44.** Objection to Justice Snyder's question was made during the next court session. *See* Trial Tr., at 3216.

**45.** One reason for the lack of prejudice is that the jury had already heard testimony that the company's (Chambers') personnel had faced violence and the threat thereof.

prosecution's witness. Such questioning went beyond the ordinary realm of judicial questioning of witnesses (i.e., to clarify confusing or misleading testimony). However, the questioning was upheld on appeal. Francolino does not cite precedent indicating that Justice Snyder's questions constituted *per se* prejudice or reversible error. While Justice Snyder's actions were improper, the Appellate Division's affirmation in this case was not contrary to clearly established federal law, nor was it an unreasonable application thereof. Any prejudice caused by Justice Snyder's intervention was *de minimus* –while Justice Snyder's "human being" comment may have minimized the importance of the mistake, her questioning of the undercover detective also led to his admission that he had made "a number of mistakes," a fact helpful to Francolino.

Francolino also cites an instance in which Justice Snyder allegedly rehabilitated a witness by asking a leading question "laden with facts damaging" to Francolino:

> **The Court:** And during the time when Mr. Francolino was present in what turns out to be Mr. Pecoraro's discussion with you and Mr. Francolino about bid rigging, did Mr. Francolino in any way contradict anything Mr. Pecoraro said?
>
> **Mr. Fischetti:** Objection.
>
> **Mr. Futerfas:** Objection.
>
> **Mr. White:** Objection to the leading.
>
> **Mr. Fischetti:** Objection to the leading.
>
> **The Court:** I'm sorry.
>
> **The Witness:** No.
>
> **Mr. Dugan:** I didn't hear the answer.
>
> **The Court:** Withdrawn.
>
> **Mr. Fischetti:** Thank you.
>
> **The Court:** He said, "No." That's withdrawn at this point.

Trial Tr., at 8802–03. The Court agrees with Francolino that the question of whether Francolino had contradicted Mr. Pecoraro was leading. However, Justice Snyder's recitation of predicate facts in the question was not inappropriate. In fact, Mr. Fischetti had earlier asked a question "with regard to the bid rigging conversation," without the qualifying use of "alleged" or "supposed." Trial Tr., at 8801. While the judge has a duty to be more circumspect when reciting predicate facts in a question, this Court does not find that such a recitation in this instance was harmful. As noted previously, the Appellate Division upheld Justice Snyder's questioning. Again, Francolino points to no Supreme Court precedent indicating that Justice Snyder's leading question was a basis for a finding of *per se* prejudice or automatic reversal. An independent review by this Court underscores the fact that this question asked by Justice Snyder was, if misguided, harmless. Likewise, Justice Snyder should not have repeated the witness's answer after she had determined to withdraw her question. However, her repetition of the answer was not prejudicial and does not indicate bias on her part.

Francolino alleges that Justice Snyder engaged in a lengthy series of leading questions designed to negate Francolino's argument that Sal Benedetto, the owner of Chambers, was orchestrating investigative decisions for his own company's financial benefit, not out of fear. According to Francolino, Justice Snyder intervened during the cross examination to ask leading questions to undermine the defense theory that Sal Benedetto was "calling the shots." Motion Brief, at 42. The exchange occurred as follows:

> **Q.:** And it's still your testimony that Sal did not run this investigation?
>
> **A.:** That is right.
>
> **The Court:** Obviously I would assume that you had to take some advice from

Sal as to your decisions pertaining to carters since you were learning the industry. Is that accurate?

**Mr. Fischetti:** Objection.

**Mr. Futerfas:** Objection.

**Mr. White:** Objection, your Honor.

**Mr. Spund:** Objection.

**The Court:** Overruled.

**Q.:** And his instructions–

**The Court:** Excuse me. The investigative decisions, were they made by the Police Department?

**The Witness:** Yes, they were.

**The Court:** And in conjunction with the District Attorney's office?

**Mr. Futerfas:** Objection.

**The Court:** Overruled.

**The Witness:** Yes, they were.

**The Court:** That in no way meant that you didn't have to learn the carting business from people who had been in it like Sal. Is that accurate?

**Mr. Futerfas:** Objection.

**Mr. White:** Objection.

**The Court:** Overruled.

**The Witness:** Yes, it is.

**The Court:** You want to be fresh, go right ahead.

**Mr. Fischetti:** I didn't say a word. I didn't even object.

**The Court:** You're doing a song and dance, I only asked one or two questions. It's hard to keep awake during your lengthier questioning.

Trial Tr., at 8765–67. The Court agrees that Justice Snyder's intervention was inappropriate. The form of two of her questions–a statement followed by "Is that accurate?"–is a textbook example of an improper leading question. Her admonition to defense counsel, telling them not to be "fresh," was also inappropriate, as defense counsel were merely objecting to the trial court's improper questions. Finally, her remark before the jury that she found defense counsel's questions boring was entirely unnecessary. However, the issue before this Court is not whether Justice Snyder acted correctly but whether her behavior forms the basis for habeas corpus relief. As noted *supra*, the Appellate Division found no error in Justice Snyder's questioning, and this adjudication is entitled to deference. While this Court is troubled by Justice Snyder's intervention here, it does not find that the question at issue reflects prejudice motivated by her alleged bias.

Another example of Justice Snyder's allegedly improper questioning arose after the undercover detective was reviewing a transcript in which Francolino allegedly stated, "You know we're not doing anything or saying anything on having a conspiracy in any way that's totally illegal." Trial Tr., at 8771. *Sua sponte*, Justice Snyder interrupted defense counsel and asked, "Incidentally, what was your understanding of what Mr. Francolino meant when he said that he wasn't doing anything totally illegal." *Id.* at 8871. The remark drew objections from several defense lawyers, who also objected to Justice Snyder's tone. *Id.* at 8772. The Court agrees that Justice Snyder's intervention did not clarify the record and risked eliciting testimony damaging to Francolino. Justice Snyder appears to have recognized the impropriety of her question by withdrawing it. *See* Trial Tr., at 8772. While this intervention by Justice Snyder was unwarranted, it was upheld on appeal, and Francolino cites no precedent indicating that the Appellate Division's decision was contrary to, or an unreasonable application of, clearly established federal law. Moreover, he never explains how the remark prejudiced Francolino, other than to state that it is an example of the judge's partiality. While the questioning was inappropri-

ate, a review of the record as a whole does not indicate that this question indicates Justice Snyder's alleged bias.

### v. Justice Snyder's Alleged Double Standard

Francolino argues that Justice Snyder's partiality can be seen in the fact that she made "disparate rulings regarding identical questions by the prosecution and by defense counsel." Motion Brief, at 43. Francolino gives the following example:

> **Q.:** What was your understanding with respect to what he [co-indictee Vulpis] meant?
>
> **Mr. Futerfas:** Objection
>
> **The Court:** Overruled.
>
> **The Witness:** That he wanted another individual that was working with him in settling this problem and he later on mentioned a name P.J. Piccolo of Dynamic Carting [ ... ].

Trial Tr., at 3702–03. Francolino asserts that this ruling was incorrect, because the "auditor is competent to testify as to his own understanding of a speaker's remark." Motion Brief, at 44. In contrast, Francolino argues, Justice Snyder sustained the prosecution's objection to the same type of question when asked by the defense:

> **Q.:** Mr. Pecoraro said, I told you right now everybody is pursuing the lawsuit. What was your understanding of what he meant?
>
> **Mr. Dugan:** Objection
>
> **The Court:** Sustained.

Trial Tr., at 7163.

Francolino's argument on this point is simplistic. Every evidentiary objection must be understood in context. An identical statement, for example, might be considered an excited utterance in one circum-

stance and not in another. The mere fact that both questions seek to determine the listener's understanding of what the speaker meant does not necessitate that objections to the question should be decided in the same way. In the instant case, while the former question was designed to elicit a relatively minor detail, in the second case, the question was designed, according to respondents, to determine "whether one of the codefendants was telling the truth at a particular point during a particular conversation." Opp. Brief., at 38–39. Given the two different circumstances in which the questions arose, Justice Snyder was not in error in treating them separately, overruling an objection in the former case and sustaining it in the latter.[46]

Another example of the allegedly disparate treatment received by the defense and prosecution pointed out by Francolino concerns questions calling on the witness to characterize another's state of mind. However, the Court need not address Francolino's argument her concerning disparate treatment because none occurred. Francolino argues that "the court was rigorous in sustaining objections to defense questions [ ... ]." Motion Brief, at 44. However, a review of the record reveals this to be a half-truth. In fact, after some legal wrangling, Justice Snyder permitted the defense to ask whether Francolino "appeared to be satisfied" with the undercover detective's identity. Trial Tr., at 7550. This is virtually the identical question which defense counsel had sought to ask to begin with: "Did Mr. Francolino appear satisfied with your identity?" Trial Tr., at 7547. Francolino's example of partial treatment has no basis since the defense was permitted to ask the question they had originally sought to ask.

---

**46.** Additionally, Justice Snyder permitted defense counsel to ask numerous questions regarding the undercover detective's "under- standing" of various statements. *See, e.g.,* Trial Tr., at 7134, 7135, 7137, 7139, 7140, 7144, 7152, 7154, 7156, 7157, 7158.

### vi. Justice Snyder's Instructions

In addition to Justice Snyder's allegedly improper remarks and questions, Francolino identifies several instructions that he claims are faulty and demonstrate her bias. One such matter relates to Justice Snyder's instruction regarding a detective's notes which were not provided to the defense because they were allegedly lost. In giving an instruction pursuant to New York's *Rosario* rule, the judge stated to the jury that the missing notes were "inadvertently lost." Trial Tr., at 3958. According to Francolino, this instruction was improper because it effectively neutralized any adverse inference the jury might draw. Whatever the merits of Francolino's argument, Justice Snyder's instruction was not objected to at the time of trial. Moreover, Francolino only casually mentions the *Rosario* instruction in a footnote devoid of any legal analysis. *See* Motion Brief, at 40 n.18. It is difficult to see, and Francolino provides no explanation, how an alleged violation of a New York lost document instruction translates into a due process violation. In addition, Francolino was not prejudiced by the instruction, as the important element, that the jury was permitted to draw an adverse inference, was properly communicated to the jury.

### vii. Justice Snyder's Rulings During Summations

Francolino argues that Justice Snyder's anti-defense prejudice led her to make various erroneous and prejudicial rulings during the summations. As an example of an incorrect ruling, he points to Justice Snyder's interruption of Mr. White's summation in which he expressed his hope that Francolino not be "convicted on guilty association." Trial Tr., at 11674. Justice Snyder replied that "Of course, I'll be instructing you that nobody can be convicted by guilty by association. That's some-

thing any school child knows." Trial Tr., at 11675. An examination of the context of Justice Snyder's remark reflects that before Justice Snyder interrupted him, Mr. White had stated as to the dangers of guilt by association:

> if a jury or a juror would abandon the principles of proof beyond a reasonable doubt, presumption of innocence and the truthfulness or untruthfulness of a witness, and were to find a defendant guilty based on his associations, well, then, you know, we might as well abolish juries and burn down the courthouses and the law books because we would be a nation of private sentiment and prejudice, not a nation of law.

Trial Tr., at 11674–75. Yet Justice Snyder permitted him to continue. However, when he turned to the definition of proof beyond a reasonable doubt, Justice Snyder interrupted and explained that it was her prerogative, and not that of the attorneys, to explain the law. *See* Trial Tr., at 11675. Justice Snyder was correct in this assertion. Although her assertion that "any school child knows" that guilt by association is not permitted was gratuitous, her underlying legal point was correct and supported Francolino's position. Francolino was therefore not prejudiced by this incident.

Francolino cites a point in his summation where Justice Snyder allegedly sustained an objection she herself made:

> **Mr. White:** [ ... ] His profit was the difference between what he charged the customer.
>
> **The Court:** Sustained. Proceed.
>
> **Mr. White:** I need a sidebar, your Honor.
>
> **The Court:** No, you don't. Proceed along another line.

**Mr. Dugan:** Your honor– [47]

**The Court:** Do not argue in front of the jury. I already listened to you make a number of illegal arguments that are frankly misleading to this jury.

**All Defense Lawyers:** Objection.

**The Court:** Now, proceed.

**Mr. White:** I would like you to identify the arguments that I made illegally.

**The Court:** I will at the appropriate time.

**Mr. White:** Please do. I don't think I made a single illegal argument.

Trial Tr., at 11520–21. Francolino argues that the court was "employing a tactic of disrupting defense summations." Motion Brief, at 47. With respect to the underlying objection, one can infer that the prosecutor had begun to object or had at least risen to his feet in order to object. During the extended colloquy that followed this incident, none of the lawyers accused Justice Snyder of making a *sua sponte* objection.[48] Regardless, an objection was proper at this point because Justice Snyder had just ruled in favor of the defense, waiting to "see where he's going." Trial Tr., at 11519. Mr. White's summation at the time of the interruption was improper. First, as respondents note, Mr. White was discussing the pricing system of a particular customer–a topic about which no evidence had been introduced. *See* Trial Tr., at 11519–20. Moreover, the jury could have easily understood Mr. White to be making

an improper economic justification argument–hinting that the company, Chambers, had an unfair advantage because it recycled the material it collected. *See id.* at 11524. This argument was precluded by Justice Snyder in her *in limine* rulings. *See id.* at 11524.

As noted *supra,* "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Additionally, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel [ ... ] ordinarily do not support a bias or partiality challenge." *Id.* at 555, 114 S.Ct. 1147. The exception to that rule is where the bias comes from an extrajudicial source, which is not the case here. The Appellate Division has held that Justice Snyder's comments did not prejudice Francolino. Nothing argued by Francolino alters the Court's determination that Justice Snyder acted reasonably in the situation. Although her statement that Mr. White's arguments were "misleading to the jury" was perhaps ill-advised, the Court finds no reason why the Appellate Division's affirmance was contrary to, or an unreasonable application of, federal law. For this reason, Justice Snyder's statements do not reveal bias nor did they prejudice Francolino.[49]

---

47. While the transcript states that Mr. Dugan is speaking, from the context it is evident that the speaker here is Mr. White.

48. The fact that the stenographer may have been rushed is also evidenced by the apparently incorrect reference to Mr. Dugan when it appears Mr. White was speaking. *See supra,* note 47.

49. Additionally, after the lengthy colloquy, Justice Snyder brought the jury back into the courtroom. She told them that "[s]ometimes

we all get a little heated. The main thing is that both sides have to have a fair opportunity to present their arguments in accordance with the law." Trial Tr., at 11555. This curative instruction made it clear to the jury that the apparent friction in the courtroom was not necessarily improper. She also indicated that she would allow some of the arguments made by Mr. White, repairing any damage he may have suffered in the eyes of the jury. *See* Trial Tr., at 11555.

### viii. Justice Snyder's Jury Instructions

Francolino claims that Justice Snyder's jury instructions were biased in favor of the prosecution. The Appellate Division disposed of this claim on direct appeal, holding that the "court gave correct and balanced jury charges [ ... ]." *People v. Association of Trade Waste Removers of Greater New York*, 267 A.D.2d 137, 701 N.Y.S.2d 12, 15 (1st Dep't 1999). Nothing indicates that the Appellate Division incorrectly applied the law. Francolino cites no precedent indicating that Justice Snyder's jury charges were incorrect or slanted in favor of one side. Respondents note that the allegedly biased language was derived from the leading New York Court of Appeals case, *Aimcee Wholesale Corp. v. Tomar Prods., Inc.*, 21 N.Y.2d 621, 289 N.Y.S.2d 968, 237 N.E.2d 223 (1968). *See* Opp. Brief, at 72. Francolino also complains that the jury instructions include a list of the government's allegations. However, most charges include a summary of the government's allegations or a reading of the indictment.

Francolino also challenges the fact that the jury instructions condemned four "purported justifications" for the charged customer allocation arrangement. Trial Tr., at 12336. However, despite Francolino's assertions such justifications had been raised by defendants throughout the trial. Therefore, these jury instructions were correct. Francolino's other complaints regarding the jury charge are that Justice Snyder mentioned the "acting in concert" principle twice during the charge, and that, in response to a jury note asking about "guilt by association," Justice Snyder repeated the acting-in-concert charge on accomplice liability.[50] In both instances, Francolino merely states that Justice Snyder was motivated by bias, without citing any precedent or making a detailed argument. The Appellate Division has already disposed of these claims and this Court sees no basis to upset that finding.

### f. Francolino Was Not Prejudiced by Justice Snyder's Sentencing

 Finally, Francolino argues that he received a "disproportionate" sentence from Justice Snyder, who sentenced him "vindictively." Motion Brief, at 33, 52. Francolino's sentence was affirmed by the Appellate Division. Francolino argues that the lengthy sentence was motivated by the fact that Justice Snyder saw him as a "prima donna." As noted *supra*, that characterization concerned Francolino's requests to travel during his trial, and did not reflect Justice Snyder's view of him personally. Moreover, sentences have been upheld where judges have used far more personally antagonistic language. *See, e.g., United States v. Pearson*, 203 F.3d 1243, 1252, 1277–78 (10th Cir.2000) (sentence affirmed where allegedly biased judge stated that defendant was a "predator, a manipulator who preys on women," "repulsive," and a "poster boy for a life sentence in a federal penitentiary"). Fundamentally, it is the "court's prerogative, if not its duty, to assess the defendant's character and crimes at sentencing, after the defendant's guilt has been decided." *Id.* at 1278. Justice Snyder was within her prerogatives in considering Francolino's character and the nature of his crimes at sentencing.

### B. Allegedly Faulty Jury Instruction

 Francolino objects to a jury instruction given by Justice Snyder that al-

---

**50.** In the latter case, contrary to Francolino's contention, Justice Snyder first informed the jury (as per defense counsel's instructions) that "there is no concept that's legally recognized of guilty by association." Trial Tr., at 12737.

legedly diluted the standard of proof beyond a reasonable doubt:

Now, each of you has it within your power to draw proper, reasonable and just inferences from the testimony, the exhibits and the stipulations. In other words, from the evidence in this case. And to determine the reasonable probabilities arising from the case after carefully analyzing and weighing the testimony of each witness and all the other evidence in the case.

Trial Tr., at 12265. Later, after emphasizing that the burden of proof remains upon the prosecution throughout the trial and "never shifts to any defendant," Justice Snyder explained the concept of reasonable doubt. Trial Tr., at 12297. Francolino does not take issue with the trial court's language on reasonable doubt; instead, he argues that the "reasonable probabilities" language diluted the subsequent reasonable doubt instruction. Respondents concede that this issue is properly presented for review. *See* Opp. Brief., at 80.

As a preliminary matter, the Court notes that the Appellate Division adjudicated this issue, affirming the conviction, and finding that the court "gave correct and balanced jury charges on the People's burden of proof [ ... ]." *People v. Association of Trade Waste Removers of Greater New York*, 267 A.D.2d 137, 701 N.Y.S.2d 12, 15 (1st Dep't 1999). Habeas corpus relief is only appropriate if this determination was contrary to, or an unreasonable application of, clearly established federal law. Francolino is not able to meet this standard.

It is well-settled that "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *United States v. Sogomonian*, 247 F.3d 348, 351 (2d Cir.2001) (citing *Jackson v. Virginia*, 443 U.S. 307, 320 n. 14, 99 S.Ct. 2781, 61

L.Ed.2d 560 (1979)). More importantly, "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (citation omitted).

Justice Snyder, after giving the "reasonable probabilities" instruction, delivered a detailed charge outlining the precise contours of reasonable doubt:

A reasonable doubt is not just any kind of a doubt. It's not a whim, or a guess or a feeling that someone may not be guilty. The human mind can conceive of doubt in virtually every and any situation. The requirement of proof beyond a reasonable doubt is not a requirement of proof beyond all doubt, or beyond any doubt or to a mathematical or scientific certainty. Why not? Because that would not be possible in courts of law where testimony–cases rest upon testimony of human beings and human recollection. It wouldn't be possible. And the law recognizes that fact. The law has created a very high standard of proof in criminal cases, much higher than in a civil case for example. But it is not an impossible standard of proof. It is proof beyond a reasonable doubt. Proof beyond a reasonable doubt. Nor is the rule of guilt beyond a reasonable doubt to be used by any juror as an excuse to avoid performing what may be a disagreeable duty. A reasonable doubt is a doubt which you conscientiously have after the use of your powers of reasoning which arise out of the credible evidence or lack of credible evidence in the case. It is a doubt for which you can actually give a reason. The standard of reason must prevail. And if and when you are convinced that you have no doubt in reason [sic] of a defendant's

guilt, then that is sufficient and you must render a verdict accordingly.

On the other hand, obviously, if you have such a reasonable doubt arising out of the credible evidence or lack of it as to any element of any particular crime charged to you, then the benefit of that doubt must obviously be given to the defendant.

Trial Tr., at 12298–99. This thorough explanation of reasonable doubt was not objected to by defense counsel.

. Francolino relies primarily on *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) for support. *Sullivan*, however, is not on point because that case involved an instruction on reasonable doubt itself that was erroneous.[51] Justice Snyder's instruction was not improper. The "reasonable probabilities" language referred not to the innocence or guilt of the defendants but to the process of drawing supportable inferences and conclusions from the evidence presented. Moreover, even a cursory review of the language at issue in *Sullivan* reveals that the case is inapplicable with regard to Justice Snyder's instructions–nowhere in her instructions does she charge the jury that reasonable doubt means doubt giving rise to "grave uncertainty"; that reasonable doubt means a "substantial doubt"; or that conviction on "moral certainty" is permissible. A review of the other cases cited by Francolino also leads the Court to conclude that the Appellate Division decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law. For this reason, Fran-

colino's arguments with respect to the alleged dilution of the reasonable doubt standard must be rejected.

## V. Conclusion

For the reasons set forth above, Francolino's petition for habeas corpus relief pursuant to 28 U.S.C. § 2254 is DENIED. The Clerk of the Court is directed to close the file in this proceeding.

**SO ORDERED.**

---

**51.** The Supreme Court in *Sullivan* did not quote the jury instruction but stated that it was virtually identical to one in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The jury instruction in that case defined reasonable doubt as "such doubt as would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. It is an actual substantial doubt. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a moral certainty." *Id.* at 40, 111 S.Ct. 328.